Royal F. Oakes (080480), roakes@barwol.com
Michael A. S. Newman (205299), mnewman@barwol.com
BARGER & WOLEN LLP
633 West Fifth Street, 47th Floor
Los Angeles, California 90071
Telephone: (213) 680-2800
Facsimile: (213) 614-7399

Attorneys for Defendant
The Lincoln National Life Insurance Company

### UNITED STATES DISTRICT COURT

### NORTHERN DISTRICT OF CALIFORNIA

TIMOTHY E. MCNARY,

       Plaintiff,

    vs.

THE LINCOLN NATIONAL LIFE
INSURANCE COMPANY; and DOES 1
through 10, inclusive,

       Defendants.

)
)
)
)
)
)
)
)
)
)
)
)

CASE NO.:

C 07 4901 EMC

NOTICE OF REMOVAL; DECLARATION OF MICHAEL A. S. NEWMAN

Complaint Filed:    August 20, 2007

BARGER & WOLEN LLP
633 W. FIFTH ST.
FORTY-SEVENTH FLOOR
LOS ANGELES, CA 90071
(213) 680-2800

i:\office7\7197\208\07pleadings\removal_notice of removal mcnary v.3_fed.doc

NOTICE OF REMOVAL; DECLARATION OF MICHAEL A. S. NEWMAN

1  Royal F. Oakes (080480), roakes@barwol.com
   Michael A. S. Newman (205299), mnewman@barwol.com
2  BARGER & WOLEN LLP
   633 West Fifth Street, 47th Floor
3  Los Angeles, California 90071
   Telephone: (213) 680-2800
4  Facsimile: (213) 614-7399

5
   Attorneys for Defendant
6  The Lincoln National Life Insurance Company

7                      UNITED STATES DISTRICT COURT

8                    NORTHERN DISTRICT OF CALIFORNIA

9

10  TIMOTHY E. MCNARY,                    )   CASE NO.:
                                          )
11          Plaintiff,                     )   NOTICE OF REMOVAL; DECLARATION
                                          )   OF MICHAEL A. S. NEWMAN
12      vs.                               )
                                          )
13  THE LINCOLN NATIONAL LIFE            )
    INSURANCE COMPANY; and DOES 1         )
14  through 10, inclusive,                )
                                          )
15          Defendants.                    )   Complaint Filed:  August 20, 2007
    _____)

16

17

18

19

20

21

22

23

24

25

26

27

28

i:\office7\7197\208\07pleadings\removal_notice of removal mcnary v.3_fed.doc

NOTICE OF REMOVAL; DECLARATION OF MICHAEL A. S. NEWMAN

1    TO THE UNITED STATES DISTRICT COURT FOR THE NORTHERN DISTRICT OF
2 || CALIFORNIA:

3

4    PLEASE TAKE NOTICE that pursuant to 28 U.S.C. Section 1446, Defendant Lincoln
5 || National Life Insurance Company ("Lincoln National") hereby removes Case No. SCV 241354
6 || from the Superior Court of the State of California, County of Sonoma to this Court. Removal of
7 || this action is proper for the following reasons:

8

9    1. Lincoln National is a non-fictitiously named defendant in the civil action filed on or
10 || about August 20, 2007, in the Superior Court of the State of California, County of Sonoma, entitled
11 || "Timothy E. McNary, Plaintiff v. The Lincoln National Life Insurance Company; and Does 1
12 || through 10, Inclusive, Defendants," Case No. SCV 241354. A true and correct copy of the
13 || Complaint is attached as Exhibit "A," to the Declaration of Michael A. S. Newman ("Newman
14 || Decl."), appended hereto.

15

16                                    **TIMELINESS**

17

18    2. The first date upon which Lincoln National received a copy through service of the
19 || Complaint and other documents in this case was August 24, 2007 when Plaintiff Timothy E.
20 || McNary ("Plaintiff") served Lincoln National.

21

22    3.    This removal is timely under 28 U.S.C. Section 1446(b), in that removal is sought
23 || within thirty days after service of the Summons and Complaint, which was the initial receipt by
24 || Lincoln National of a copy of the initial pleadings in this action.

25

26

27

28

BARGER & WOLEN LLP
633 W. FIFTH ST.
FORTY-SEVENTH FLOOR
LOS ANGELES, CA 90071
(213) 680-2800

-2-

NOTICE OF REMOVAL; DECLARATION OF MICHAEL A. S. NEWMAN

1

2

## DIVERSITY JURISDICTION

3    4.    This case is a civil action for which this Court has jurisdiction under the provisions

4  of 28 U.S.C. Section 1332, and is one that may be removed to this Court by Lincoln National

5  pursuant to provisions of 28 U.S.C. Section 1441(b), in that it is a civil action between citizens of

6  different states and the matter in controversy exceeds the sum of $75,000, exclusive of interest and

7  costs, as set forth more fully below.

8

9    5.    Plaintiff alleges that he is, and at all relevant times was, "a resident and citizen of the

10  State of California." (Exhibit "A," at ¶ 4.) Plaintiff is thus a citizen of California.

11

12    6.    A corporation is deemed to be a citizen of any State by which it has been

13  incorporated and of the State where it has its principal place of business. *United Computer*

14  *Systems, Inc. v. AT&T Corp.*, 298 F. 3d 756, 763 (9th Cir. 2002). Lincoln National is a corporation

15  organized and existing under the laws of the State of Indiana, having its principal place of business

16  therein. (Newman Decl., Exh. "B".) Plaintiff further admits that Lincoln National is "duly

17  organized and existing under and by the virtue of the laws of the State of Indiana." (Newman Decl.,

18  Exh. "A", ¶ 2). Lincoln National's principal place of business is also Indiana. A corporation has

19  only one principal place of business. See 28 U.S.C. Section 1332(c)(1); *see also United Computer*

20  *Systems, Inc. v. AT&T Corp.*, 298 F. 3d 756, 763 (9th Cir. 2002). The principal place of business is

21  the state where a "substantial predominance" of corporate activity takes place, *or* where the

22  majority of its executive and administrative functions are performed. *United Computer Systems,*

23  *Inc.*, *supra* at 763. As evidenced by Newman Decl., Exh. "B," the substantial predominance of

24  Lincoln National's corporate activity takes place, and the majority of its executive and

25  administrative functions are performed, in Indiana, and outside of California. At all times pertinent,

26  the citizenship status of Lincoln National as a citizen of the State of Indiana has remained the same.

27  (Newman Decl., Exh. "B".) Accordingly, at the time of the filing of the complaint and the filing of

28  this Notice of Removal, Lincoln National was and is a citizen of the State of Indiana. (Newman

BARGER & WOLEN LLP
633 W. FIFTH ST.
FORTY-SEVENTH FLOOR
LOS ANGELES, CA 90071
(213) 680-2800

-3-

NOTICE OF REMOVAL; DECLARATION OF MICHAEL A. S. NEWMAN

1  Decl., Exh. "B".)  Furthermore, Lincoln National's citizenship is attested to in numerous district

2  court opinions.  Furthermore, Lincoln's citizenship is attested to in published district court opinions.

3  *See Lincoln Nat'l Life Ins. Co. v. Johnson*, 38 F. Supp. 2d 440, 443 (E.D. Va. 1999) ("Lincoln is

4  incorporated in Indiana, and has its principal place of business there."); *Goldstein v. Lincoln Nat'l*

5  *Life Ins. Co.*, 970 F. Supp. 598, 599 (E.D. Mich. 1997) ("Lincoln [is] . . . an Indiana corporation

6  with its principal place of business in Indiana . . . ."); *Frank v. Lincoln Nat'l Life Ins. Co.*, 555 F.

7  Supp. 808, 809 (E.D. Pa. 1983) ("Indiana, where defendant, Lincoln, is incorporated and has its

8  principal place of business . . . .").

9

10  7.  Based on Paragraphs 4 through 6 above, there is complete diversity of citizenship among

11  Plaintiff and Lincoln National.

12

13  ## AMOUNT IN CONTROVERSY

14

15  8.  Defendants are not required to prove in absolute terms that more than $75,000.00 is

16  at issue.  Rather, a "defendant must provide evidence establishing that it is 'more likely than not'

17  that the amount in controversy exceeds" $75,000.  *Sanchez v. Monumental Life Ins. Co.*, 102 F.3d

18  398, 403 (9th Cir. 1996).  Here, there is no question that the amount in controversy well exceeds

19  $75,000.

20

21  9.  In his Complaint, Plaintiff purports to seek benefits due under a policy of disability

22  income insurance.  Plaintiff alleges the policy provides payment at a rate at the rate of $3,700 per

23  month, and a maximum benefit of 60 months if the disability commences before the age of 61.

24  (Complaint, paragraphs 9, 12, and 18.)  Plaintiff is currently about 57 (see Exhibit A (the attached

25  policy) to Complaint (Newman Decl., Exh "A")).  Sixty months of benefits at $3,700/month adds

26  up to an amount in excess of $200,000.  In addition, Plaintiff seeks punitive damages and

27  attorneys' fees (Complaint, page 12).  *Conrad v. Hartford Accident & Indem. Co.*, 994 F. Supp.

28  1196, 1198 (N.D. Cal. 1998) (finding that special and general damages, attorneys' fees, and

BARGER & WOLEN LLP
633 W. FIFTH ST.
FORTY-SEVENTH FLOOR
LOS ANGELES, CA 90071
(213) 680-2800

-4-

NOTICE OF REMOVAL; DECLARATION OF MICHAEL A. S. NEWMAN

1  punitive damages are included in the calculation of the amount in controversy). Although Lincoln
2  National denies that it is in fact liable for any part of these amounts, or that Plaintiff could be
3  entitled to future benefits in this action, it is beyond question that the amount in controversy exceeds
4  $75,000.

**PROCESS**

8  10.    Exhibit "A" attached hereto constitutes the entire process and pleadings filed in the
9  state court action.

11  11.    This Notice of Removal is being filed without prejudice to the objections and
12  defenses of Lincoln National.

14  12.    Written notice of the filing of this Notice of Removal has been given to all adverse
15  parties, and a copy has been filed with the Clerk of the Superior Court of the State of California,
16  County of Santa Clara, in accordance with the provisions of 28 U.S.C. Section 1446(d).

18  WHEREFORE, Lincoln National prays that the above action pending in the Superior Court
19  of California for the County of Santa Clara be removed from that court to this Court.

21  Dated: September 21 , 2007                  BARGER & WOLEN LLP

23                                              By: _____
24                                                  ROYAL F. OAKES
                                                    MICHAEL A. S. NEWMAN
                                                    Attorneys for Defendant The Lincoln
25                                                  National Life Insurance Company

BARGER & WOLEN LLP
633 W. FIFTH ST.
FORTY-SEVENTH FLOOR
LOS ANGELES, CA 90071
(213) 680-2800
-5-
NOTICE OF REMOVAL; DECLARATION OF MICHAEL A. S. NEWMAN

1

## **DECLARATION OF MICHAEL A. S. NEWMAN**

2

3      I, Michael A. S. Newman, declare as follows:

4

5      1.  I am an attorney licensed to practice in this Court and all the courts in the State of

6   California, and am an associate with Barger & Wolen, LLP, counsel of record for Lincoln National

7   Life Insurance Company ("Lincoln National"), defendant in this action.  I am one of the attorneys

8   with responsibility for the handling of this matter.  I have personal knowledge of the matters set

9   forth below, and if necessary could competently testify as to such matters.

10

11      2.  Attached hereto as Exhibit "A" is a true and correct copy of the Summons and

12   Complaint in the above-referenced action. Attached hereto as Exhibit "B" is a true and correct copy

13   of the relevant portion of Lincoln National's profile in the 2006 AM Best's Insurance Report.

14

15      I declare under the laws of the State of California and the United States that the

16   foregoing is true and correct.

17

18      Executed this _21 st_ day of September 2007, at Los Angeles, California.

19

20                                      MICHAEL A. S. NEWMAN

21

22

23

24

25

26

27

28

BARGER & WOLEN LLP
633 W. FIFTH ST.
FORTY-SEVENTH FLOOR
LOS ANGELES, CA 90071
(213) 680-2800

-6-

NOTICE OF REMOVAL; DECLARATION OF MICHAEL A. S. NEWMAN

AUG-29-2007  11:26                                                    P.03

Box 140

## SUMMONS
### (CITACION JUDICIAL)

**SUM-100**

FOR COURT USE ONLY
(SOLO PARA USO DE LA CORTE)

**NOTICE TO DEFENDANT:**
*(AVISO AL DEMANDADO):*

THE LINCOLN NATIONAL LIFE INSURANCE COMPANY; and DOES 1
through 10, inclusive

**YOU ARE BEING SUED BY PLAINTIFF:**
*(LO ESTÁ DEMANDANDO EL DEMANDANTE):*

TIMOTHY E. MCNARY

**ENDORSED
FILED**

AUG 2 0 2007

SUPERIOR COURT OF CALIFORNIA
COUNTY OF SONOMA

You have 30 CALENDAR DAYS after this summons and legal papers are served on you to file a written response at this court and have a copy served on the plaintiff. A letter or phone call will not protect you. Your written response must be in proper legal form if you want the court to hear your case. There may be a court form that you can use for your response. You can find these court forms and more information at the California Courts Online Self-Help Center (www.courtinfo.ca.gov/selfhelp), your county law library, or the courthouse nearest you. If you cannot pay the filing fee, ask the court clerk for a fee waiver form. If you do not file your response on time, you may lose the case by default, and your wages, money, and property may be taken without further warning from the court.

There are other legal requirements. You may want to call an attorney right away. If you do not know an attorney, you may want to call an attorney referral service. If you cannot afford an attorney, you may be eligible for free legal services from a nonprofit legal services program. You can locate these nonprofit groups at the California Legal Services Web site (www.lawhelpcalifornia.org), the California Courts Online Self-Help Center (www.courtinfo.ca.gov/selfhelp), or by contacting your local court or county bar association.

Tiene 30 DÍAS DE CALENDARIO después de que le entreguen esta citación y papeles legales para presentar una respuesta por escrito en esta corte y hacer que se entregue una copia al demandante. Una carta o una llamada telefónica no lo protegen. Su respuesta por escrito tiene que estar en formato legal correcto si desea que procesen su caso en la corte. Es posible que haya un formulario que usted pueda usar para su respuesta. Puede encontrar estos formularios de la corte y más información en el Centro de Ayuda de las Cortes de California (www.courtinfo.ca.gov/selfhelp/espanol), en la biblioteca de leyes de su condado o en la corte que le quede más cerca. Si no puede pagar la cuota de presentación, pida al secretario de la corte que le dé un formulario de exención de pago de cuotas. Si no presenta su respuesta a tiempo, puede perder el caso por incumplimiento y la corte le podrá quitar su sueldo, dinero y bienes sin más advertencia.

Hay otros requisitos legales. Es recomendable que llame a un abogado inmediatamente. Si no conoce a un abogado, puede llamar a un servicio de remisión a abogados. Si no puede pagar a un abogado, es posible que cumpla con los requisitos para obtener servicios legales gratuitos de un programa de servicios legales sin fines de lucro. Puede encontrar estos grupos sin fines de lucro en el sitio web de California Legal Services, (www.lawhelpcalifornia.org), en el Centro de Ayuda de las Cortes de California, (www.courtinfo.ca.gov/selfhelp/espanol) o poniéndose en contacto con la corte o el colegio de abogados locales.

| The name and address of the court is: <br>*(El nombre y dirección de la corte es):* | CASE NUMBER: <br>*(Número del Caso):* **241354** |
|---|---|

SUPERIOR COURT OF THE STATE OF CALIFORNIA
FOR THE COUNTY OF SONOMA
Hall of Justice, Room 107-J, 600 Administration Drive, Santa Rosa, California 95403

The name, address, and telephone number of plaintiff's attorney, or plaintiff without an attorney, is:
*(El nombre, la dirección y el número de teléfono del abogado del demandante, o del demandante que no tiene abogado, es):*
FRANK N. DARRAS #128904                        909.390.3770
SHERNOFF BIDART & DARRAS, LLP
3257 East Guasti Road, Suite 300, Ontario, CA 91761      Julia Shields

DATE:  AUG 2 0 2007        DENISE L. GORDON, Clerk, by _____ Deputy
*(Fecha)*                        Clerk, by *(Secretario)*        *(Adjunto)*

*(For proof of service of this summons, use Proof of Service of Summons (form POS-010).)*
*(Para prueba de entrega de esta citación use el formulario Proof of Service of Summons, (POS-010).)*

**NOTICE TO THE PERSON SERVED:** You are served
1. [ ]  as an individual defendant.
2. [ ]  as the person sued under the fictitious name of (specify):

3. [X]  on behalf of (specify): The Lincoln National Life Insurance Company

    under: [X] CCP 416.10 (corporation)      [ ] CCP 416.60 (minor)
           [ ] CCP 416.20 (defunct corporation)   [ ] CCP 416.70 (conservatee)
           [ ] CCP 416.40 (association or partnership)  [ ] CCP 416.90 (authorized person)
           [ ] other (specify):
4. [ ]  by personal delivery on (date):

Form Adopted for Mandatory Use
Judicial Council of California
SUM-100 [Rev. January 1, 2004]

**SUMMONS**

Code of Civil Procedure §§ 412.20, 465

COPY

## EXHIBIT A                                7

AUG-29-2007  11:26                                                                   P.04

1   FRANK N. DARRAS #128904
2   SHERNOFF BIDART & DARRAS, LLP
    3257 East Guasti Road, Suite 300                        ENDORSED
3   Ontario, CA 91761                                         FILED
4   Telephone:  (909) 390-3770                              AUG 2 0 2007
    Facsimile:  (909) 974-2121
5                                                       SUPERIOR COURT OF CALIFORNIA
    Attorneys for Plaintiff                                COUNTY OF SONOMA
6

7              SUPERIOR COURT FOR THE STATE OF CALIFORNIA

8                    FOR THE COUNTY OF SONOMA COUNTY

9
    TIMOTHY E. MCNARY,              Case No.: $\mathcal{L}$ V   241354
10
              Plaintiff,            COMPLAINT AND JURY DEMAND
11
12  vs.                            1) Breach of the Duty of Good Faith and
                                      Fair Dealing;
13  THE LINCOLN NATIONAL LIFE      2) Breach of Contract
    INSURANCE COMPANY; and DOES 1
14  through 10, Inclusive,
15
              Defendants.
16

17

18  Plaintiff alleges as follows:

19                        GENERAL ALLEGATIONS

20                            Introduction

21        1.    Plaintiff, TIMOTHY E. MCNARY ("MR. MCNARY") purchased a disability

22  income policy from Defendant, THE LINCOLN NATIONAL LIFE INSURANCE

23  COMPANY ("LINCOLN") in or about 1995.

24        2.    Some eleven (11) years later, MR. MCNARY became disabled and sought

25  financial help when he could no longer perform the substantial and material duties of his

26  occupation as a handyman electrician and plumber.

27        3.    But, instead of paying MR. MCNARY the full benefits to which he was

28  entitled under the terms of the Policy, LINCOLN, which boasts on its website that it

                                   - 1 -
    COPY           COMPLAINT AND JURY DEMAND

                                      8

1    "...has total assets of $87 billion," unreasonably delayed payment; misapplied the

2    Elimination Period; and failed to pay interest on the small amount of benefits that it

3    finally paid to a gentleman who unfortunately experienced a psychotic break due to his

4    subsequently diagnosed condition of bipolar disorder[1].

5                                    **Factual Allegations**

6            4.      Plaintiff is, and at all relevant times was, a resident and citizen of the State

7    of California.

8            5.      Plaintiff alleges upon information and belief that Defendant, THE

9    LINCOLN NATIONAL LIFE INSURANCE COMPANY, is, and at all relevant times was,

10   a corporation duly organized and existing under and by virtue of the laws of the State of

11   Indiana and authorized to transact and transacting the business of insurance in this

12   state.

13           6.      The true names of capacities, whether individual, corporate, associate, or

14   otherwise, of Defendants, DOES 1 through 10, inclusive, are unknown to Plaintiff, who

15   therefore sues said Defendants by such fictitious names. Plaintiff is informed and

16   believes and on such information and belief alleges that each of the Defendants sued

17   herein as a DOE is legally responsible in some manner for the events and happenings

18   referred to herein, and will ask leave of this court to amend this Complaint to insert their

19   true names and capacities in place and instead of the fictitious names when the same

20   _____

21   [1] Bipolar disorder, also known as manic-depressive illness, is a brain disorder that causes unusual shifts

22   in a person's mood, energy, and ability to function. Different from the normal ups and downs that

     everyone goes through, the symptoms of bipolar disorder are severe. Bipolar disorder causes dramatic
23
     mood swings—from overly "high" and/or irritable to sad and hopeless, and then back again. Severe
24
     changes in energy and behavior go along with these changes in mood. The periods of highs and lows are
25   called episodes of mania and depression. Sometimes, severe episodes of mania or depression include

26   symptoms of psychosis (or psychotic symptoms). Common psychotic symptoms are hallucinations

     (hearing, seeing, or otherwise sensing the presence of things not actually there) and delusions (false,
27
     strongly held beliefs not influenced by logical reasoning or explained by a person's usual cultural
28   concepts). In MR. MCNARY's case, that psychotic break resulted in his hospitalization in a psychiatric

     lock down facility and the use of full restraints.

                                        - 2 -
                          **COMPLAINT AND JURY DEMAND**

1    become known to Plaintiff.

2        7.    At all relevant times, Defendants, and each of them, were the agents and

3    employees of each of the remaining Defendants, and were at all times acting within the

4    purpose and scope of said agency and employment, and each Defendant has ratified

5    and approved the acts of his agent.

6        8.    At all relevant times herein, MR. MCNARY was covered under Disability

7    Income Policy number 15 6140202 by LINCOLN to MR. MCNARY on or about May 18,

8    1995 (the "Policy"). A copy of the Policy is attached hereto as Exhibit "A."

9        9.    According to the terms of the Policy, if MR. MCNARY became disabled,

10    LINCOLN promised to pay him benefits as follows:

SHERNOFF BIDART DARRAS
LAWYERS FOR INSURANCE POLICYHOLDERS

| TERM | DEFINITION |
|---|---|
| Elimination Period | 90 Days |
| Monthly Benefit | $2,950<br>(Plus Automatic Benefit Increases) |
| Maximum Benefit Period | |

| | Age at start of Disability | Maximum Benefit Period |
|---|---|---|
| | Before age 61 | 60 months |

| Total Disability | "Total Disability" before benefits have been paid for 24 months for a Period of Disability, means that due to Injury or Sickness:<br>a. You are unable to perform the substantial and material duties of Your Occupation; and<br>b. You are under a Physician's Care. We will waive this requirement if We receive written proof acceptable to Us that further Physician's Care would be of no benefit to You.<br><br>After benefits have been paid for 24 months for a Period of Disability, Total Disability means that due to Injury or Sickness: |

- 3 -
COMPLAINT AND JURY DEMAND

| | | |
|---|---|---|
| | ████████ | ████████ |
| | | a. You are unable to perform the substantial and material duties of Your Occupation; |
| | | b. You are not engaged in any other gainful occupation; and |
| | | c. You are under a Physician's Care. We will waive this requirement if We receive written proof acceptable to Us that further Physician's Care would be of no benefit to You[2]. |
| | Occupation | "Occupation" means the occupation (or occupations, if more than one) in which You are engaged at the start of Your disability. |

10. At all relevant times herein, all premiums due under the Policy have been paid and MR. MCNARY has performed all his obligations under the Policy.

11. On or about June 27, 2006, MR. MCNARY became disabled under the terms of the Policy due to his subsequently diagnosed condition of bipolar disorder, for which he was hospitalized from on or about June 27, 2006 to July 7, 2006.

12. MR. MCNARY timely submitted a claim for disability benefits to LINCOLN, and, on or about September 6, 2006, the Administrative Agent of LINCOLN, Metropolitan Life Insurance Company ("MetLife") wrote to MR. MCNARY and stated:

- "...you are claiming total disability commencing June 24, 2006."
- "The policy provides for a $3,700.00 monthly indemnity, following a 90 day elimination period where no benefits are payable."
- "Considering June 24, 2006 as your initial date of disability, the elimination period would be satisfied on September 22, 2006, should you meet the terms

---

[2] To the extent that any disability definitions are in conflict with California law, Plaintiff alleges that California law applies. ("California law requires courts to deviate from the explicit policy definition of 'total disability'...where it is necessary to offer protection to the insured when he is no longer able to carry out the substantial and material functions of his (insured's own) occupation." *Hangarter v. Provident Life & Acc. Ins. Co* 373 F3d at 1006; *Moore v. American United Life Ins. Co.* (1984) 150 CA3d 610, 620, 197 CR 878, 884.)

1    and provisions of the policy."

2    13.    On or about March 8, 2007, MR. MCNARY wrote to LINCOLN's

3    administrator, MetLife, to confirm his ongoing disability and stated:

4    • "I have been quite ill and have not been able to pull a letter together for

5    you."

6    • "I am still disabled, I cannot work."

7    • "Some of my symptoms...irritable, angry and hostile; restless; very poor

8    concentration, show poor judgment; increased impulsivity...loss of

9    energy...difficulty concentrating."

10   • "While in Palo Verde, which is a lock-down mental facility...I...[had] a full-

11   blown psychotic episode."

12   • "There have now been three board certified psychiatrist[s] who have

13   diagnosed me with manic/depressive bipolar disorder...Dr. Mackey...Dr.

14   Lee...Mukund Gnanadesikan...MD."

15   14.    Having not received the disability payments to which he was entitled, MR.

16   MCNARY was forced to hire an attorney. On or about May 25, 2007, MetLife wrote to

17   that attorney, and stated:

18   • "We...received the medical information requested from Dr. Gnanadesikan

19   and forwarded it to our consulting board certified psychiatrist for review."

20   • "Based on our review, we remain unclear of Mr. McNary's level of

21   impairment; however, the records document appropriate treatment and

22   subjective complaints."

23   • "Therefore, we will be scheduling Mr. McNary to attend an Independent

24   Medical Examination (IME) with a neuropsychologist in his area."

25          ▪ (NOTE: The neuropsychological testing of MR. MCNARY on or

26          about May 25, 2007 specifically determined his disability which negates

27          any alleged "uncertainty" about MR. MCNARY's "level of impairment"

28          and the further need for neuropsychological testing for at least another

- 5 -
COMPLAINT AND JURY DEMAND

12

1            year.)

2       15.    Even though MR. MCNARY remained totally disabled under the Policy

3    from on or about June 24, 2006, in MetLife's May 25, 2007, letter to MR. MCNARY's

4    attorney, it unreasonably applied the Elimination Period; did not agree to pay MR.

5    MCNARY all of the disability benefits to which he was entitled, and failed to pay interest

6    on the late payment, as follows:

7         • "In the interim, we will be paying total disability benefits for the period of

8         June 24, 2006 through August 6, 2006 and from January 12, 2007 through the

9         present, less the elimination period."

10        • "...the 90 day elimination period was satisfied on February 26, 2007."

11             ▪ (NOTE: As MR. MCNARY remained disabled under the Policy from

12             on or about June 24, 2006, the Elimination Period was satisfied on or

13             about September 22, 2006.)

14        • "Therefore, under separate cover we have sent benefits for the period of

15        February 27, 2007 through May 26, 2007."

16             ▪ (NOTE: Benefits should have been reasonably paid from on or

17             about September 22, 2006.)

18        • "In addition, the policy will be place on waiver of premium."

19        • "We will also refund any premiums paid during the above referenced

20        periods of disability under separate cover."

21       16.    Additionally, MetLife's letter on or about May 25, 2007, unreasonably

22    advised MR. MCNARY's attorney that it was refusing the request for information upon

23    which any claim determination was based. According to the letter:

24        • "...we...decline your requests to release information contained in our file,

25        to include information concerning our medical consultants..."

26       17.    On or about May 25, 2007, MR. MCNARY was examined and tested by

27    Marc S. Walter, Ph.D. (Diplomate in Clinical Neuropsychology; American Board of

28    Professional Psychology; and, American Board of Clinical Neuropsychology). According

SHERNOFF BIDART DARRAS
LAWYERS FOR INSURANCE POLICYHOLDERS

1   to his subsequent report dated on or about May 29, 2007, which substantiated MR.

2   MCNARY's ongoing and continuing disability since on or about June 27, 2006:

3       • "...he was hospitalized at the Palo Verde Psychiatric Hospital from

4       06/27/06 to 07/07/06."

5       • "He was diagnosed with bipolar disorder with a manic episode."

6       • "He listed his current medications as Depakote[3], Geodon[4], Ambien [5]CR...

7       and...Levothroid[6]."

8       • "...he has been off work since his admission to the Palo Verde Hospital on

9       06/26/06."

10      • "He has been unable to return to work...because it is now extremely

11  difficult for him to remember information and to concentrate."

12      • "This is especially important because his job entails tracking how electrical

13  circuits fit together."

14      • "He also notes problems with ongoing chronic fatigue, diminished attention

15  span in general, generalized anxiety (with specific anxiety that he will make a

16  mistake in working on wiring...) and diminished motivation secondary to

17  continued high levels of depression."

18      • "He has continued being followed psychiatrically and currently sees a

19  psychiatrist every month as well as receiving SMI services including

20  counseling...on a weekly basis."

21

22

23  [3] This medication is used to treat certain psychiatric conditions, including the manic phase of bipolar

24  disorder. Side effects include: diarrhea; dizziness; drowsiness; blurred/double vision; shakiness (tremor);
    unsteadiness; serious liver problems and pancreatitis.

25  [4] Side effects of this medication include: drowsiness; dizziness; and nausea.

26  [5] This medication is a sedative with the following side effects: drowsiness; dizziness and a "drugged"
    feeling.

27  [6] This medication is a man made version of the principle thyroid hormone, thyroxine (T4). Side effects

28  include: symptoms of hyperthyroidism (chest pain, increased heart rate or pulse rate, excessive sweating,
    heat intolerance, nervousness, headache; insomnia, diarrhea, vomiting).

- 7 -

COMPLAINT AND JURY DEMAND

1          • "He has just been recent diagnosed with hypothyroidism[7]."

2          • "He related that the psychiatrist and psychologist he has been working

3       with did not feel he will be able to return to work."

4       • **TESTING RESULTS AND CONCLUSIONS:**

5             ▪ "...the most likely diagnosis for him is a Bipolar I disorder, Most

6             Recent Episode of Manic, Unspecified."

7             ▪ "...this neuropsychological evaluation of Mr. McNary finds that he

8             has relatively poor memory and attention, difficulty with spatial relations,

9             significantly lower intellectual functioning than expected especially for

10            visual reasoning (which was a clear strength for him in the past),

11            weakness and diminished coordination, and impaired executive

12            functioning."

13            ▪ "These cognitive impairments are the result of his bipolar

14            disorder..."

15            ▪ "I would add the diagnosis of Cognitive Disorder secondary to

16            bipolar disorder."

17            ▪ "...the patient is certainly **disabled from any occupation** due to

18            his cognitive and mental health problems."

19            ▪ "Given the fact that he is almost a year post his hospitalization at

20            Palo Verde for a manic episode, and he has persisting problems, it is

21            probable that he will continue to have these problems..."

22            ▪ "He is receiving appropriate treatment for mental health

23            problems..." (Emphasis added.)

24       18.    Even though MR. MCNARY has been, and remains, totally disabled under

25

26       _____

27       [7] Sometimes the thyroid doesn't produce enough hormones, upsetting the balance of chemical reactions
         in the body. This condition is known as hypothyroidism, or underactive thyroid disease. Symptoms

28       include: fatigue; sluggishness; muscle aches, tenderness and stiffness; pain, stiffness and joint swelling;
         muscle weakness and depression.

1  the terms of the subject Policy, to date, LINCOLN has unreasonably failed and refused

2  to pay MR. MCNARY the benefits to which he is entitled.

3

4      PLAINTIFF, TIMOTHY E. MCNARY, FOR A FIRST CAUSE OF ACTION

5  AGAINST DEFENDANTS, THE LINCOLN NATIONAL LIFE INSURANCE COMPANY;

6  and DOES 1 through 10, inclusive, FOR BREACH OF THE DUTY OF GOOD FAITH

7  AND FAIR DEALING, ALLEGES:

8      19.    Plaintiff refers to each and every paragraph of the General Allegations and

9  incorporates those paragraphs as though set forth in full in this cause of action.

10     20.    Defendants, and each of them, have breached their duty of good faith and

11  fair dealing owed to Plaintiff in the following respects:

12         a.    Unreasonably failing to make payments to Plaintiff at a time when

13     Defendants knew that Plaintiff was entitled to the payments under the terms

14     of the Policy.

15         b.    Unreasonably delaying payments to Plaintiff knowing Plaintiff's

16     claim for benefits under the Policy to be valid.

17         c.    Unreasonably withholding payments from Plaintiff knowing

18     Plaintiff's claim for benefits under the Policy to be valid.

19         d.    Unreasonably misrepresenting to Plaintiff pertinent facts and

20     insurance Policy provisions relating to the coverage in issued.

21         e.    Failing to reasonably and promptly investigate and process

22     Plaintiff's claim for benefits.

23         f.    Not attempting in good faith to effectuate a prompt, fair and

24     equitable settlement of Plaintiff's claim for benefits in which liability has

25     become reasonably clear.

26         g.    Failing to promptly provide a reasonable explanation of the basis

27     relied upon in the Policy, in relation to the applicable facts, for the delay in

28     payment of Plaintiff's claim for benefits.

- 9 -
COMPLAINT AND JURY DEMAND

h.    Plaintiff is informed and believes and thereon alleges that
Defendant has breached its duty of good faith and fair dealing owed to
Plaintiff by other acts or omissions of which Plaintiff is presently unaware and
which will be shown according to proof at the time of trial.

21.    As a proximate result of the aforementioned unreasonable conduct of
Defendants, Plaintiff has suffered, and will continue to suffer in the future, damages
under the Policy, plus interest, and other economic and consequential damages, for a
total amount to be shown at the time of trial.

22.    As a further proximate result of the aforementioned unreasonable conduct
of Defendants, Plaintiff has suffered anxiety, worry, mental and emotional distress, all to
Plaintiff's general damage in a sum to be determined at the time of trial.

23.    As a further proximate result of the unreasonable conduct of Defendants,
Plaintiff was compelled to retain legal counsel to obtain the benefits due under the
Policy. Therefore, Defendants are liable to Plaintiff for those attorneys' fees, witness
fees and costs of litigation reasonably necessary and incurred by Plaintiff in order to
obtain the Policy benefits in a sum to be determined at the time of trial.

24.    Defendants' conduct described herein was intended by Defendants to
cause injury to Plaintiff or was despicable conduct carried on by the Defendants with a
willful and conscious disregard of the rights of Plaintiff, or subjected Plaintiff to cruel and
unjust hardship in conscious of Plaintiff's rights, or was an intentional misrepresentation,
deceit, or concealment of a material fact known to the Defendants with the intention to
deprive Plaintiff of property, legal rights or to otherwise cause injury, such as to
constitute malice, oppression or fraud under California Civil Code §3294, thereby
entitling Plaintiff to punitive damages in an amount appropriate to punish or set an
example of Defendants.

25.    Defendants' conduct was highly reprehensible because (1) it caused
plaintiff not only substantial economic loss, but also personal physical injury and
physical sickness; (2) it demonstrated defendants' indifference and reckless disregard

- 10 -
COMPLAINT AND JURY DEMAND

1   as to the health and safety of Plaintiff; (3) It was repeated and continuous, rather than

2   just an isolated incident; (4) It caused harm to plaintiffs not by accident, but rather by

3   defendants' intentional malice, trickery, and deceit; and (5) plaintiff was financial

4   vulnerable to Defendants' conduct.

5        26.    Defendants' conduct described herein was undertaken by the corporate

6   Defendant's deputies or managing agents, identified herein as DOES 1 through 100,

7   who were responsible for claims supervision and operations, underwriting,

8   communications and/or decisions. The aforedescribed conduct of said managing agents

9   and individuals was therefore undertaken on behalf of the corporate Defendants. Said

10  corporate Defendants further had advance knowledge of the actions and conduct of

11  said individuals whose actions and conduct were ratified, authorized, and approved by

12  managing agents whose precise identities are unknown to Plaintiff at this time are

13  therefore identified and designated herein as DOES 1 through 10, inclusive.

14

15       PLAINTIFF, TIMOTHY E. MCNARY, FOR A SECOND CAUSE OF ACTION

16  AGAINST DEFENDANTS, THE LINCOLN NATIONAL LIFE INSURANCE COMPANY;

17  and DOES 1 through 10, inclusive, FOR BREACH OF CONTRACT, ALLEGES:

18       27.    Plaintiff refers to each and every paragraph of the General Allegations and

19  incorporates those paragraphs as though set forth in full in this cause of action.

20       28.    Defendants, and each of them, owed duties and obligations to Plaintiff

21  under the Policy.

22       29.    Defendants, and each of them, breached the terms and provisions of the

23  insurance Policy by failing and refusing to pay benefits under the Policy as set forth in

24  the second paragraph of the First Cause of Action, incorporated herein by referenced.

25       30.    As a direct and proximate result of Defendants' conduct and breach of

26  their contractual obligations, Plaintiff has suffered damages under the Policy in an

27  amount to be determined according to proof at the time of trial.

28       WHEREFORE, Plaintiff prays for judgment against Defendants, and each of

1    them, as follows:

2         AS TO THE FIRST CAUSE OF ACTION AGAINST DEFENDANTS, THE

3    LINCOLN NATIONAL LIFE INSURANCE COMPANY; and DOES 1 through 10,

4    Inclusive, FOR BREACH OF THE DUTY OF GOOD FAITH AND FAIR DEALING:

5         1.    Damages for failure to provide benefits under the Policy, plus interest,

6    including prejudgment interest, and other economic and consequential damages, in a

7    sum to be determined at the time of trial;

8         2.    General damages for mental and emotional distress in a sum to be

9    determined at the time of trial;

10        3.    For attorneys' fees, witness fees and costs of litigation incurred by Plaintiff

11   to obtain the Policy's benefits in an amount to be determined at the time of trial;

12        4.    Punitive and exemplary damages in an amount appropriate to punish or

13   set an example of Defendants;

14        5.    For costs of suit incurred herein; and,

15        6.    For such other and further relief as the Court deems just and proper.

16        AS TO THE SECOND CAUSE OF ACTION AGAINST DEFENDANTS, THE

17   LINCOLN NATIONAL LIFE INSURANCE COMPANY; and DOES 1 through 10,

18   Inclusive, FOR BREACH OF CONTRACT:

19        1.    Damages under the Policy in an amount to be determined according to

20   proof at the time of trial;

21        2.    For costs of suit incurred herein; and,

22   ///

23   ///

24   ///

25   ///

26   ///

27   ///

28   ///

1   3.    For such other and further relief as the Court deems just and proper.

2

3   DATED: August 17, 2007              SHERNOFF BIDART & DARRAS, LLP

4

5

6                                      FRANK N. DARRAS
                                       Attorneys for Plaintiff
7

8                              **DEMAND FOR JURY TRIAL**

9

10   Plaintiff hereby demands a trial by jury.

11

12                                     SHERNOFF BIDART & DARRAS, LLP

13

14

15                                     FRANK N. DARRAS
                                       Attorneys for Plaintiff
16

17

18

19

20

21

22

23

24

25

26

27

28

- 13 -
COMPLAINT AND JURY DEMAND

AUG-29-2007  11:29                                                                P.17

Abraham Lincoln
℠ 01234⁄56

# LINCOLN NATIONAL
# LIFE INSURANCE CO.

## A part of LINCOLN NATIONAL CORPORATION

### (A STOCK COMPANY)

We have issued this Policy to You in consideration of the full first premium and the statements made in Your application. A copy of the application is attached to and is a part of this Policy.

We agree to pay You the benefits provided in this Policy for loss due to an Injury or Sickness that begins while this Policy is in force.

**NONCANCELLABLE AND GUARANTEED RENEWABLE TO AGE 65.** You may continue this Policy to Your 65th birthday by payment of the premium on each renewal date. We cannot cancel this Policy. As long as the premium is paid on time, We cannot change this Policy or its premium rate until Your 65th birthday.

**RENEWAL OPTION AFTER YOU REACH AGE 65. SUBJECT TO CHANGE IN PREMIUM RATES.** You may renew this Policy as long as You are actively and regularly employed on a full time basis; there is no age limit. You must pay premiums on time at Our premium rates then in effect at time of renewals. For further details, see the Renewal Option provision.

**READ THIS POLICY CAREFULLY.** This is a legal contract between You and The Lincoln National Life Insurance Company.

**RIGHT TO RETURN THIS POLICY.** This Policy may be returned, within 20 days after its receipt, to the agent through whom it was purchased or to Our Home Office. Upon cancellation, We will refund any premium paid and this Policy will be void from the beginning.

Signed for The Lincoln National Life Insurance Company at its Home Office in Fort Wayne, Indiana.

Robert A. Anker, President

C. Suzanne Womack, Secretary

Examined by

Countersigned by

Disability Income Insurance Policy
Noncancellable to Age 65
Nonparticipating - No Dividends.

N400

000014

# EXHIBIT A
# DUPLICATE

AUG-29-2007  11:30

## Table of Contents

No Table of Contents Present

ONAME IN ABC

+i400

000015

**EXHIBIT A**

**DUPLICATE**

## POLICY SCHEDULE

INSURED: TIMOTHY E MC NARY                    POLICY NUMBER: 15 6140202
              AGE: 45                                RATE CLASS: 5A
DATE OF ISSUE: MAY 18, 1995                          BILLING: DIRECT BILL

### PREMIUM DUE DATES AND AMOUNTS

PREMIUM PAYMENT INTERVAL ELECTED -  QUARTERLY

BEGINNING ON MAY 18, 1995

| TOTAL ANNUAL PREMIUM | TOTAL SEMIANNUAL PREMIUM | TOTAL QUARTERLY PREMIUM | TOTAL MONTHLY PREMIUM |
|---|---|---|---|
| $2,137.33 | $1,098.64 | $556.81 | $184.67 |

IF YOU ARE ELIGIBLE TO RENEW THIS POLICY AFTER AGE 65, RATES WILL BE THOSE
IN EFFECT AT THE TIME OF RENEWALS.

PAGE 3

000016               EXHIBIT  A

                      DUPLICATE

## POLICY SCHEDULE

INSURED: TIMOTHY E MC NARY                    POLICY NUMBER: 15 6140202

AGE: 65                                        RATE CLASS: 3A

DATE OF ISSUE: MAY 16, 1995                    BILLING: DIRECT BILL

PERSONAL DISABILITY INCOME FROM LINCOLN - BASIC BENEFIT ONE

ELIMINATION PERIOD                            90 DAYS

TOTAL DISABILITY MONTHLY BENEFIT              $2,950

MAXIMUM BENEFIT PERIOD FOR TOTAL DISABILITY
OR PRESUMPTIVE TOTAL DISABILITY STARTING:
    BEFORE AGE 61                             60 MONTHS
    AT AGE 61 BUT BEFORE AGE 62               48 MONTHS
    AT AGE 62 BUT BEFORE AGE 63               42 MONTHS
    AT AGE 63 BUT BEFORE AGE 64               36 MONTHS
    AT AGE 64 BUT BEFORE AGE 65               30 MONTHS
    AT OR AFTER AGE 65 BUT BEFORE AGE 75      24 MONTHS
    AT OR AFTER AGE 75                        12 MONTHS

ANNUAL BASIC BENEFIT PREMIUM  $2,204.59  UNTIL AGE 65

BENEFITS PROVIDED BY RIDER FOR BASIC BENEFIT

                                                        RIDER ANNUAL
                                                        PREMIUM

RESIDUAL DISABILITY BENEFIT RIDER                       $   432.75

        PREMIUMS ON PAGE 3 INCLUDE A 15% NON TOBACCO USER DISCOUNT
        PREMIUMS ON PAGE 3 INCLUDE A VOLUME DISCOUNT

                            PAGE 3A

000017

EXHIBIT  A

DUPLICATE

24

## POLICY SCHEDULE

INSURED: TIMOTHY E MC NARY                    POLICY NUMBER: 15 6160282

AGE: 45                                        RATE CLASS: 5A

DATE OF ISSUE: MAY 18, 1995                    BILLING: DIRECT BILL
-------------------------------------------------------------------

### AUTOMATIC BENEFIT INCREASE - BASIC BENEFIT

THIS BENEFIT PROVIDES FOR 5 AUTOMATIC INCREASES OF $150.00 EACH IN THE TOTAL DISABILITY MONTHLY BENEFIT SHOWN ON PAGE 3A, SUBJECT TO CERTAIN LIMITATIONS. THE INCREASES WILL OCCUR ONCE A YEAR OVER A TERM OF 5 YEARS. WE WILL NOT REQUIRE ANY EVIDENCE OF INSURABILITY FOR THE INCREASES TO TAKE EFFECT. THE INCREASES WILL BE EFFECTIVE ON THE DATES SHOWN BELOW.

EACH AUTOMATIC INCREASE IN BENEFIT WILL RESULT IN AN INCREASE IN THE PREMIUM FOR THE POLICY. A RESIDUAL DISABILITY BENEFIT RIDER, A COST OF LIVING RIDER, OR AN EXTENDED OWN OCCUPATION RIDER MAY BE ATTACHED TO THIS POLICY. IF SO, THE PREMIUM FOR EACH RIDER WILL INCREASE EACH TIME THE BENEFIT UNDER THE POLICY INCREASES. PREMIUM FOR EACH INCREASE ARE BASED ON YOUR ATTAINED AGE ON THE INCREASE DATE AND ARE SHOWN BELOW. IF ALL INCREASES GO INTO EFFECT, YOUR ANNUAL PREMIUM WILL INCREASE BY A TOTAL OF $665.18    BY THE LAST INCREASE DATE.

| INCREASE DATE | INCREASE IN ANNUAL PREMIUM |
|---|---|
| MAY 1996 | $115.29 |
| MAY 1997 | $123.96 |
| MAY 1998 | $131.65 |
| MAY 1999 | $143.27 |
| MAY 2000 | $149.93 |

AN AUTOMATIC INCREASE IN BENEFIT WILL APPLY ONLY TO A DISABILITY WHICH STARTS AFTER THE INCREASE DATE. IT WILL NOT APPLY TO A RECURRENT DISABILITY. IF THE PREMIUM FOR THIS POLICY IS BEING WAIVED UNDER THE WAIVER OF PREMIUM PROVISION, THE PREMIUM FOR THE INCREASE WILL ALSO BE WAIVED. WHEN YOU RESUME PAYING PREMIUMS FOR THE POLICY, YOU MUST ALSO PAY PREMIUMS FOR THE INCREASE.

IF DURING THE 5 YEAR TERM YOU APPLY FOR AN INCREASE IN THE TOTAL DISABILITY MONTHLY BENEFIT WHICH REQUIRES THAT YOU FURNISH EVIDENCE OF INSURABILITY SATISFACTORY TO US, ANY REMAINING PORTION OF THE TERM WILL END AND A NEW TERM BASED ON THE NEW LEVEL OF POLICY BENEFIT WILL BEGIN.

YOU MAY REFUSE AN AUTOMATIC INCREASE IN BENEFIT BY NOTIFYING US IN WRITING 30 DAYS PRIOR TO THE INCREASE DATE OF YOUR INTENT TO REFUSE. YOUR REFUSAL OF AN INCREASE WILL NOT AFFECT THE INCREASES FOR THE REMAINDER OF THE 5 YEAR TERM. HOWEVER, IF YOU REFUSE THE FIRST TWO INCREASES, ALL FURTHER INCREASES WILL BE CANCELLED AND THE TERM WILL END.

YOU MAY APPLY FOR ADDITIONAL AUTOMATIC BENEFIT INCREASES AT THE TIME OF THE LAST INCREASE DATE. TO APPLY FOR THE INCREASES, YOU MUST COMPLETE AN APPLICATION WE WILL SEND YOU UPON REQUEST, AND FURNISH EVIDENCE OF INSURABILITY SATISFACTORY TO US. APPLICATION MUST BE MADE WITHIN THE TIME PERIOD STARTING 60 DAYS PRIOR TO AND EXTENDING TO 30 DAYS AFTER THE LAST INCREASE DATE.

AUTOMATIC INCREASES IN BENEFIT ARE NOT AVAILABLE AFTER YOUR 60TH BIRTHDAY.

PAGE 3B

000018                    EXHIBIT  A

DUPLICATE

## DEFINITIONS

THE FOLLOWING DEFINITIONS ARE IMPOR-
TANT IN DESCRIBING YOUR RIGHTS AND OUR
RIGHTS UNDER THIS POLICY. DEFINED TERMS
ARE CAPITALIZED. REFER TO THESE DEFI-
NITIONS AS YOU READ THE POLICY.

"You" and "Your" refer to the Insured named on the
Policy Schedule.

"We," "Our," and "Us" mean The Lincoln National Life
Insurance Company. We are located at 1300 South
Clinton Street, Fort Wayne, IN 46801.

"Date of Issue" is the date this Policy becomes ef-
fective. It is shown on the Policy Schedule.

"Elimination Period" is the number of days, beginning
with the day Your Period of Disability starts, for which
no Disability Benefits are provided. It is shown on
the Policy Schedule.

"Maximum Benefit Period" is the longest period of
time We will pay Disability Benefits. It is shown on
the Policy Schedule.

"Sickness" means a sickness or disease that first
appears (makes itself known) while this Policy is in
force. It includes disability from transplant surgery
where You are a donor, or cosmetic surgery. If such
transplant or cosmetic surgery takes place more than
6 months after the Date of Issue of this Policy.

"Injury" means an accidental bodily injury that occurs
while this Policy is in force.

"Occupation" means the occupation (or occupations,
if more than one) in which You are engaged at the
start of Your disability.

"Physician" means a licensed medical practitioner
practicing within the scope of his or her license. A
Physician must be someone other than You or a
family member.

"Physician's Care" means treatment by a Physician
which is appropriate for the condition causing the
disability and is consistent with prevailing medical
standards.

"Total Disability", before benefits have been paid for
24 months for a Period of Disability, means that due
to Injury or Sickness:

a. You are unable to perform the substantial and
material duties of Your Occupation; and

b. You are under a Physician's Care. We will waive
this requirement if We receive written proof ac-
ceptable to Us that further Physician's Care would
be of no benefit to You.

N400N

After benefits have been paid for 24 months for a
Period of Disability, Total Disability means that due
to Injury or Sickness:

a. You are unable to perform the substantial and
material duties of Your Occupation;

b. You are not engaged in any other gainful
occupation; and

c. You are under a Physician's Care. We will waive
this requirement if We receive written proof ac-
ceptable to Us that further Physician's Care would
be of no benefit to You.

"Period of Disability" means continuing periods of
Total Disability. Successive Periods of Disability will
be deemed to be continuing if they are:

a. due to the same or related conditions; and

b. separated by no more than 12 months;

otherwise such periods will be deemed to be new
and separate disabilities.

"Disability Benefit" means the Total Disability Benefit.

"Pre-existing Condition" means a Sickness or phys-
ical condition for which, prior to the Date of Issue:

a. symptoms existed that would cause an ordinarily
prudent person to seek diagnosis, care, or
treatment; or

b. medical advice or treatment was recommended
by or received from a Physician.

## BENEFITS

**Total Disability Benefit.** You must be Totally Disabled
for the entire Elimination Period. The Total Disability
Monthly Benefit shown on the Policy Schedule will
be paid thereafter while Your Total Disability contin-
ues.

Disability Benefits are not payable for days of disa-
bility which occur before the end of the Elimination
Period. Disability Benefits will not be paid beyond
the Maximum Benefit Period. For periods of Total
Disability of less than one month, We will pay 1/30th
of the monthly benefit for each day of disability.

**Survivor Benefit.** If You die while receiving benefits
under this Policy and if You were Totally Disabled for
at least 24 months prior to Your date of death, We
will pay a benefit to Your beneficiary, or Your estate
if a beneficiary has not been named. We will pay the
Total Disability Monthly Benefit for up to three
months, but not beyond the remainder of the Maxi-
mum Benefit Period.

We must receive written notice of Your death before
We will pay this benefit.

**Presumptive Total Disability.** If Injury or Sickness
causes You to entirely and permanently lose:

a. Your speech; or



AUG-29-2007  11:31                                                          P.23

b. Your hearing in both ears; or

c. Your sight in both eyes; or

d. use of both hands; or

e. use of both feet; or

f. use of one hand and one foot;

We will consider You to be Totally Disabled even if You are able to engage in an occupation.. Further care and treatment by a Physician is not required.

This benefit will be paid in accordance with the Total Disability provisions of this Policy. Benefits will begin on the date of loss, however, if earlier than the date the Disability Benefit would otherwise begin. We will pay this benefit for the Maximum Benefit Period specified for Presumptive Total Disability. This benefit will be paid in lieu of all other benefits under this Policy.

Waiver of Premium. After Your Period of Disability has lasted for 90 days, We will:

a. refund any premiums that became due and were paid during this 90 day period; and

b. waive the payment of any premiums that become due thereafter while Your Period of Disability continues.

The premium to be waived will be the premium according to the mode of premium payment in effect when Your Period of Disability starts.

Once Your Period of Disability ends, this Policy can be kept in force by paying any premiums that become due.

Rehabilitation. We will pay for the cost of services You incur during a Period of Disability in connection with a program of vocational rehabilitation if:

a. We enter into an agreement with You on both the program and the services; and

b. the cost of the services is not covered by another plan or program.

Participation in such a program will not affect Your eligibility for benefits under this Policy.

## EXCEPTIONS

Exclusion. We will not pay benefits:

a. due to an act of war, whether declared or undeclared; or

b. for any period You are incarcerated; or

c. due to normal pregnancy or childbirth, except We will pay Disability Benefits for a disability caused by:

1. complications of pregnancy or childbirth; and

2. normal pregnancy or childbirth, starting on the later of the 81st day of Your Period of Disability or the day of Your Period of Disability which immediately follows the Elimination Period.

N400N

Pre-existing Condition Limitation. If a Period of Disability starts within 3 years from the Date of Issue, and is due to a Pre-existing Condition, Disability Benefits will not be paid unless the condition:

a. was disclosed and not misrepresented on Your application; and

b. is not excluded by name or specific description.

Suspended Coverage While in Military. This Policy will be suspended if and when You enter active military service. This suspension applies to the military service of any country or international authority, but does not apply to active duty for training that lasts less than 60 days. Any premium paid beyond the date of suspension will be refunded. Upon Your release from full time active duty prior to age 63, You may put this Policy back in force without evidence of insurability. We will need written notice and payment of the required premium within 90 days of Your release from full time active duty. The premium will be at the same rate as if this Policy had not been suspended. The premium will be payable upon Your receiving written notice from Us giving the amount of premium and the period such premium will provide coverage under this Policy. The restored policy will cover only loss that results from an injury that occurs after the restoration date, or Sickness that first appears more than 10 days after such date.

## RECURRENT AND CONCURRENT DISABILITY

Recurrent Disability. We will treat a new Period of Disability as a occurrence of a prior disability if:

a. it is due to the same or related conditions; and

b. it occurs within 12 months after the end of the prior Period of Disability.

Such periods of recurrent disability will be used to determine completion of the Elimination Period.

Concurrent Disability. If Your Period of Disability is caused by more than one Injury or Sickness, or from both, benefits will be paid as if it was caused by only one Injury or Sickness.

## RENEWAL OPTION

This Policy may be renewed after Your 65th birthday for the Total Disability Benefit provided:

a. You remain actively and regularly employed for at least 30 hours each week excluding Periods of Disability; and

b. premiums are paid on time.

This Policy must be in force when You elect this option.

If this Policy is renewed after Your 65th birthday, only continuous days of Total Disability can be used to satisfy the Elimination Period.

000020

DUPLICATE EXHIBIT A

AUG-29-2007  11:31

P.24

The Maximum Benefit Period for renewals on or after your 55th birthday is shown on the Policy Schedule. We have the right to require proof from time to time that You are actively and regularly employed at least 30 hours each week.

All other provisions, limitations, and exclusions in this Policy will continue to apply.

Premiums will be based on the table of rates in effect for people also insured under this type of policy who are the same age and in the same class as You at renewal. Any premium paid after Your 55th birthday for a period not covered by this Policy under this option will be returned to You.

## CLAIMS

**Time of Disability.** Termination of this Policy will not affect any claim for benefits if Your Period of Disability begins while this Policy is in force.

**Notice of Claim.** Written notice of claim must be given to Us within 30 days after a covered loss starts, or as soon thereafter as is reasonably possible. The notice can be sent to Our Home Office in Fort Wayne, Indiana or can be given to Our agent. There is no required form, but the notice should include Your name and the policy number.

**Claim Forms.** After We receive the written notice of claim, We will send You forms for filing proof of loss. If You do not receive these within 15 days, You will meet the proof of loss requirements by giving Us a written statement of the nature and extent of the loss within the time limits stated in the Proof of Loss provision.

**Proof of Loss.** If this Policy provides periodic payments for a continuing loss, written proof of loss must be given to Us within 90 days after the end of each period for which We are liable. For any other loss, written proof of loss must be given to Us within 90 days after such loss. If it was not reasonably possible to give written proof in the time required, We will not reduce or deny the claim for this reason if such proof is given to Us as soon as reasonably possible. In any event, written proof must be given to Us no later than 1 year from the time specified unless You were legally incapacitated.

**Physical Examination.** At Our expense, We have the right to have You examined as often as reasonably necessary while Your claim continues.

**Time of Payment of Claims.** After receiving written proof of loss:

a. We will pay all Benefits then due which are not payable periodically; and

b. We will pay at the end of each 30 days any benefits due that are payable periodically, subject to continuing proof of loss.

H400K

000021

**Payment of Claims.** All benefits will be paid to You. If, however, any benefit is payable to Your estate or if You are not competent to give valid release, We can pay benefits up to $1,000 to one of Your relatives whom We consider to be entitled to the benefits. We will be legally discharged to the extent of any such payment made in good faith.

## PREMIUMS

**Premium Payments.** The first premium is due on the Date of Issue. Each premium after the first premium is due at the end of the period for which the preceding premium was paid.

The first premium is payable at Our Home Office or may be delivered to any authorized representative of the Company. Each premium after the first premium is payable only at Our Home Office. Checks for premium payments should be made payable to the Lincoln National Life Insurance Company.

The premium payment interval is shown on the Policy Schedule. The interval may be changed as provided by Our rules, except it may not be changed during a Period of Disability.

**Grace Period.** This Policy has a 31 day grace period. This means that if a premium is not paid on or before the date it is due, it may be paid during the following 31 days. This Policy will continue in force during the grace period.

If a premium is not paid before the grace period ends, this Policy will lapse. Lapse means this Policy will no longer be in force.

**Reinstatement.** If this Policy lapses due to nonpayment of premium, it will be reinstated if We or Our agent accepts payment of the unpaid premium without requiring an application for reinstatement.

If We or Our agent requires an application for reinstatement, You will be given a conditional receipt for the premium submitted with the application. If We approve Your application, this Policy will be reinstated effective the date We approve reinstatement. If We disapprove Your application, We must do so within 45 days of the date of the conditional receipt, or this Policy will be reinstated on the 45th day.

The reinstated policy will only cover loss due to:

a. injury sustained after the effective date of reinstatement; or

b. sickness that begins more than 10 days after such date.

In all other respects, Your rights and Our rights will remain the same as before the policy lapsed, subject to any provisions made a part of the reinstated policy.

DUPLICATE
EXHIBIT  A

H430M

000022

EXHIBIT  A
DUPLICATE

Residual Disability Benefits are not payable:

a. for days of Residual Disability which occur before the end of the Elimination Period; or

b. for any days for which Total Disability benefits are paid; or

c. for any Residual Disability starting after Your 65th birthday; or

d. after the end of the Residual Maximum Benefit Period; or

e. beyond the later of:

  1) Your 65th birthday; or

  2) the date on which 24 months of Disability Benefits have been paid.

The Residual Disability for which claim is made must be the cause of Your Loss of Earnings.

For periods of Residual Disability of less than one month, We will pay 1/30th of the monthly benefit for each day of disability.

The first six monthly payments for a Residual Disability will never be less than 50% of the Total Disability Monthly Benefit shown on the Policy Schedule. In the event Your Current Monthly Income is 25% or less of Your Prior Monthly Income, We will consider Your Current Monthly Income to be zero.

Return To Work benefit. We will pay a Return To Work benefit during Your Return To Work. The monthly amount We pay will be calculated as if You were Residually Disabled.

This benefit will begin on the day after Your Total or Residual Disability ends. We will continue to pay this benefit while Your Return to Work continues, but not beyond the end of the period for which Residual Disability Benefits would be payable.

Benefit Periods. The combined periods for which Total Disability Benefits, Residual Disability Benefits, and Return To Work Benefits are payable for a disability (including any Recurrent Disability) cannot exceed the Residual Maximum Benefit Period.

**PROOF OF LOSS**

In addition to the requirements set forth in the Proof of Loss provision of this Policy, We can also require reasonable proof from You and Your;

a. Prior Monthly Income; and

b. Current Monthly Income for the month for which disability is claimed.

This may include personal and business tax returns, financial statements, accountant's statements, or other proof acceptable to Us. At Our expense, We can have an audit performed as often as is reasonably required while Your claim continues.

**GENERAL PROVISIONS**

This Rider is attached to and is a part of this Policy.

The Date of Issue of this Rider is the same as the Date of Issue of this Policy unless a different Date of Issue for this Rider is shown on the Policy Schedule.

The premium for this Rider is shown on the Policy Schedule. It is payable on the dates, in the manner, and under the conditions specified in this Policy.

This Rider terminates:

a. upon Your written request; or

b. on Your 65th birthday, unless benefits will continue to be paid under the terms of this Rider; or

c. on the date Residual Disability Benefits cease to be paid after Your 65th birthday; or

d. when this Policy terminates;

whichever occurs first.

Unless changed by this Rider, all provisions, exclusions, and limitations in this Policy apply to this Rider.

THE LINCOLN NATIONAL LIFE INSURANCE COMPANY

*C. Suzanne Womack*
C. Suzanne Womack, Secretary

Countersigned by:

_____

RJ400                    000027              EXHIBIT  A
                                            DUPLICATE

SUPERIOR COURT OF CALIFORNIA, COUNTY OF SONOMA
CIVIL DIVISION
600 ADMINISTRATION DRIVE, ROOM 107-J
SANTA ROSA, CALIFORNIA 95403-2878
(707) 521-6500
www.sonomasuperiorcourt.com

(FOR COURT USE ONLY)

**ENDORSED**
**FILED**
AUG 2 0 2007
SUPERIOR COURT OF CALIFORNIA
COUNTY OF SONOMA

NOTICE OF ASSIGNMENT TO ONE JUDGE FOR ALL PURPOSES,
NOTICE OF CASE MANAGEMENT CONFERENCE,
and ORDER TO SHOW CAUSE
☐ Collections (see footnote)

Case number
SCV   241354

**A COPY OF THIS NOTICE MUST BE SERVED WITH THE SUMMONS AND COMPLAINT**
**AND WITH ANY CROSS-COMPLAINT**

1. **THIS ACTION IS ASSIGNED TO HON.** _KNOEL OWEN_ **FOR ALL PURPOSES.**
   Pursuant to California Rules of Court, Rule 2.111(7), the assigned judge's name must appear below the number of the case and the nature of the paper on the first page of each paper presented for filing.

2. A Case Management Conference has been set at the time and place indicated below:

   | Date: JAN - 7 2008 | Time: 9:00 | Courtroom: 18 |
   | Location: | 3455 Guerneville Road Santa Rosa, CA 95405 | |

3. No later than 15 calendar days before the date set for the case management conference or review, each party must file a case management statement [Judicial Council form #CM-110] and serve it on all other parties in the case. In lieu of each party's filing a separate case management statement, any two or more parties may file a joint statement.

4. At the conference, counsel for each party and each self-represented party must appear personally or by telephone [California Rules of Court, Rule 3.670(c)(2)]; must be familiar with the case; and must be prepared to discuss and commit to the party's position on the issues listed in California Rules of Court, Rule 3.727.

5. Pre-approved dispositions are recorded three (3) court days prior to the case management conference. These may be obtained by calling (707) 521-6383 or by going to http://www.sonomasuperiorcourt.com/tentative/index.php.

**ORDER TO SHOW CAUSE:**
To Plaintiff(s), Cross-complainants, and/or their attorneys of record:
If, on the date shown above, you are not in compliance with timely filing requirements stated in California Rules of Court, Rules 3.110 and/or 3.725, you must then and there show cause why this Court should not impose monetary and/or terminating sanctions.

---

\* Telephone appearances are not allowed. Case Management Conferences in Collections cases incorporate a settlement conference. Counsel/parties *with settlement authority* are required to appear in person.

CV-1 [Rev. May 22, 2007] NTC OF ASSIGNMENT OF 1 JUDGE FOR ALL PURPOSES, NTC OF CMC & OSC  CRC, Rules 2.111, 3.725-3.728; CCP§§117.5, 583.410

| ATTORNEY OR PARTY WITHOUT ATTORNEY (Name, state bar number, and address): | FOR COURT USE ONLY |
|---|---|
| TELEPHONE NO.:                         FAX NO. (Optional): E-MAIL ADDRESS (Optional): ATTORNEY FOR (Name): | |
| SUPERIOR COURT OF CALIFORNIA, COUNTY OF SONOMA 600 ADMINISTRATION DRIVE, ROOM 107-J SANTA ROSA, CALIFORNIA 95403-2878 | |
| PLAINTIFF/PETITIONER: | |
| DEFENDANT/RESPONDENT: | |

| ADR INFORMATION SHEET [Sonoma County Superior Court Rules, Rule 16] | | CASE NUMBER: |
|---|---|---|
| (Check one):  ☐ UNLIMITED CASE (Amount demanded exceeds $25,000) | ☐ LIMITED CASE (Amount demanded is $25,000 or less) | Date: Time: Location: Assigned Judge: |

## NOTICE TO ALL PARTIES AND THEIR ATTORNEYS

The policy of the Sonoma County Superior Court is:
"The formal litigation of legal claims and disputes is expensive and time consuming. The overall results achieved by some or all of the parties are often unsatisfactory. There are many modern alternatives to formal court litigation which are less expensive, less time consuming, and more beneficial to the parties. It is therefore the firm policy and goal of this court to encourage the parties in all civil cases to explore and pursue private dispute resolution alternatives at the earliest possible date." [Local Rule 16.1.]

Although most (90-95%) cases do settle, many settlements come only after a considerable amount of time, money, and resources have been expended. Such expenditures, as well as the adversarial nature of litigation, can be a disincentive to settlement. The Sonoma County Superior Court encourages the use of Alternative Dispute Resolution (ADR) as early as possible after the parties become aware of a dispute.

Most ADR processes are voluntary and are paid for by the parties themselves, but ADR has proved in many cases to be faster, cheaper, and more effective than traditional litigation.

## ADVANTAGES OF ADR:

The filing of your complaint or answer may be just the beginning of the costs that you will incur during the course of your lawsuit. Lawsuits can be extremely costly. By utilizing ADR methods early in the course of your case, you may significantly reduce these costs by either resolving the case before expensive discovery and trial proceedings are commenced or by narrowing the scope of your discovery by identifying disputed and undisputed factual and legal issues.

ADR can be a fast, economical, efficient, and effective way to resolve civil cases, and most litigants report satisfaction with the process. ADR procedures can be scheduled at your convenience and can be completed in a fraction of the time required for traditional litigation. The cost of ADR will depend on the procedure and the provider you select, and the cost is typically less than litigation.

Most ADR processes are confidential but can result in enforceable agreements. Many ADR processes will give you an opportunity to test the strengths and weaknesses of your case without adverse impact in the event of a trial. Depending upon the method of ADR you select, it may be the last chance for you to control the outcome of your dispute before you place the decision in the hands of a judge or jury.

## METHODS OF ADR:

A. MEDIATION. Mediation is one of the most frequently used methods of ADR because it is informal, quick, convenient and confidential. In this process the parties select a neutral mediator who facilitates the identification of issues and areas of agreement and assists in finding a resolution or settlement of this dispute. Since mediation requires the agreement of the parties to resolve the matter, control of the proceedings and a determination of the settlement terms remains completely in the parties' hands. The mediator remains neutral and assists the parties in arriving at terms that are mutually agreeable.

| PLAINTIFF/PETITIONER: | CASE NUMBER: |
|---|---|
| DEFENDANT/RESPONDENT: | |

**B. ARBITRATION:** The parties jointly employ a neutral third party or a panel of neutrals to listen to both sides and render a decision. The parties are free to make the arbitrator's decision binding or non-binding. When non-binding, the arbitrator's decision serves as guide or influence upon the parties to bring them closer to settlement. If it is binding, the decision of the arbitrator will be final and generally avoids any further proceedings in the case. Non-binding judicial arbitration may be ordered in certain cases before trial.

**C. EARLY NEUTRAL EVALUATION:** A neutral evaluator is hired by the parties to give an evaluation of the case to help settle it. You or your attorney will be permitted to prepare a written statement, present critical witnesses or other evidence, argue your case to the evaluator, meet separately and confidentially with the evaluator, and utilize the evaluator to communicate any settlement offers to the opposing party.

**D. PRIVATE SETTLEMENT CONFERENCE:** A voluntary settlement conference is similar to early neutral evaluation in that the parties employ a neutral settlement officer who attempts to persuade the parties to accept a compromise position. It is a form of facilitated negotiation in which the settlement officer may express an opinion about the value of the case, the substantive merits of each party's position, and the probable outcome of the trial.

There are various other methods or combinations of methods of ADR, such as summary jury trial, mini-trial, special master and discovery referee. The court encourages the parties to be creative in selecting the process which has the best chance of resolving the case as quickly, effectively, and inexpensively as possible. You will have a chance to review your ADR options at the time of the Early Mediation and Case Management Conference.

The undersigned party is willing to agree to any of the following forms of ADR at this time (for family law and probate actions only). Your selection will inform the other parties in the case of your current thoughts regarding the use of ADR. If all parties agree on a particular ADR method, you will be asked to file a stipulation on the court's form. The stipulation form (Sonoma County Superior Court form #MISC-161) can be found at the court's web site and is available at the court.)

☐ Mediation                                  ☐ Early Neutral Evaluation

☐ Non-binding Private Arbitration            ☐ Binding Private Arbitration

☐ Voluntary Settlement Conference            ☐ Summary Jury Trial

☐ Other                                      ☐ Judicial Arbitration

I / We certify that I / We have read and understood (or have had explained to me / us) the foregoing.

Date: _____          _____
                                       Signature of Party

Date: _____          _____
                                       Signature of Party

Date: _____          _____
                                       Signature of Attorney for Party
                                       ☐ Additional signatures are attached

NOTE: This form requires the signatures of the parties and their attorney. All parties must complete, file and serve this form in accordance with Sonoma County Superior Court Rules, Rule 16. See Rule 16.3 for specific filing and service instructions.

CV-2 (Rev. July 1, 2004)              ADR INFORMATION SHEET                    Page 2 of 2

AUG-29-2007  11:33

| ATTORNEY OR PARTY WITHOUT ATTORNEY (Name, state bar number, and address) | FOR COURT USE ONLY |
|---|---|
| TELEPHONE NO.:                      FAX NO. (Optional):<br>E-MAIL ADDRESS (Optional):<br>ATTORNEY FOR (Name): | |
| SUPERIOR COURT OF CALIFORNIA, COUNTY OF SONOMA<br>600 ADMINISTRATION DRIVE, ROOM 107-J<br>SANTA ROSA, CALIFORNIA 95403-2878 | |
| PLAINTIFF/PETITIONER:<br><br>DEFENDANT/RESPONDENT: | |

| STIPULATION AND ORDER REFERRING MATTER TO ALTERNATIVE DISPUTE RESOLUTION | CASE NUMBER: |
|---|---|
| (Check one):  ☐ UNLIMITED CASE<br>(Amount demanded<br>exceeds $25,000)   ☐ LIMITED CASE<br>(Amount demanded is<br>$25,000 or less) | Date:<br>Time:<br>Location:<br>Assigned Judge: |

The parties hereby stipulate to refer the case to the following Alternate Dispute Resolution Process:

☐ Mediation  ☐ Non-binding Private Arbitration
☐ Binding Private Arbitration  ☐ Private Settlement Conference
☐ Early Neutral Evaluation  ☐ Judicial Arbitration

The ADR process will be conducted by (name of individual): _____

Provider's Address: _____

Provider's Telephone: _____ Fax: _____  Email address: _____
☐ No agreement
The ADR process will be conducted on (date): _____
☐ No agreement

☐ The parties have reached agreement as to the payment of fees of ADR provider.
☐ The parties have not reached agreement as to the payment of fees of ADR provider.

| Type or print name of ☐ Party without attorney ☐ Attorney for<br>☐ Plaintiff/Petitioner ☐ Defendant/Respondent/Contestant | (Date and Sign) Attorney or party without<br>attorney (Sign in blue ink) |
|---|---|
| Type or print name of ☐ Party without attorney ☐ Attorney for<br>☐ Plaintiff/Petitioner ☐ Defendant/Respondent/Contestant | (Date and Sign) Attorney or party without<br>attorney (Sign in blue ink) |

☐  Additional signatures are attached.

CV-7 (Rev. June 18, 2005)        STIPULATION AND ORDER REFERRING MATTER TO ADR        CCR, Rules 16 & 22

| PLAINTIFF/PETITIONER: | CASE NUMBER: |
|---|---|
| DEFENDANT/RESPONDENT: | |

## ORDER

**A REVIEW HEARING IS SCHEDULED AS FOLLOWS:**

_____                    _____
             **Date**                                         **Time**

All parties must appear at the Review Hearing.  In the event that the case is settled and a dismissal, a notice of settlement or a judgment is filed at least 3 court days before the scheduled Review Hearing, the Review Hearing will be dropped  and no one should appear. You must check the phone message at _____ or go to http://www.SonomaSuperiorCourt.com/tentative/index.html where the tentative dispositions will be posted the day before you are scheduled to come to court to determine if you must appear.

### THE FIRST ATTORNEY OR PARTY LISTED  MUST FILE PROOF OF SERVICE OF A COPY OF THIS ORDER ON ALL PARTIES.

_____                    _____
             **Date**                               **JUDGE OF THE SUPERIOR COURT**

AUG-29-2007  11:33                                                                P.31

CM-110

| ATTORNEY OR PARTY WITHOUT ATTORNEY (Name, State Bar number, and address): | FOR COURT USE ONLY |
|---|---|

TELEPHONE NO.:          FAX NO. (Optional):
E-MAIL ADDRESS (Optional):
ATTORNEY FOR (Name):

SUPERIOR COURT OF CALIFORNIA, COUNTY OF
STREET ADDRESS:
MAILING ADDRESS:
CITY AND ZIP CODE:
BRANCH NAME:

PLAINTIFF/PETITIONER:

DEFENDANT/RESPONDENT:

| CASE MANAGEMENT STATEMENT | CASE NUMBER: |
|---|---|
| (Check one):  ☐ UNLIMITED CASE        ☐ LIMITED CASE | |

(Amount demanded    (Amount demanded is $25,000
exceeds $25,000)    or less)

A CASE MANAGEMENT CONFERENCE is scheduled as follows:

Date:              Time:            Dept.:        Div.:            Room:
Address of court (if different from the address above):

INSTRUCTIONS: All applicable boxes must be checked, and the specified information must be provided.

1.  Party or parties (answer one):
    a. ☐ This statement is submitted by party (name):
    b. ☐ This statement is submitted jointly by parties (names):

2.  Complaint and cross-complaint (to be answered by plaintiffs and cross-complainants only)
    a. The complaint was filed on (date):
    b. ☐ The cross-complaint, if any, was filed on (date):

3.  Service (to be answered by plaintiffs and cross-complainants only)
    a. ☐ All parties named in the complaint and cross-complaint have been served, or have appeared, or have been dismissed.
    b. ☐ The following parties named in the complaint or cross-complaint
       (1) ☐ have not been served (specify names and explain why not):

       (2) ☐ have been served but have not appeared and have not been dismissed (specify names):

       (3) ☐ have had a default entered against them (specify names):

    c. ☐ The following additional parties may be added (specify names, nature of involvement in case, and the date by which they may be served):

4.  Description of case
    a. Type of case in ☐ complaint    ☐ cross-complaint    (describe, including causes of action):

Form Adopted for Mandatory Use
Judicial Council of California
CM-110 [Rev. January 1, 2007]

CASE MANAGEMENT STATEMENT

Page 1 of 4

Cal. Rules of Court,
rules 3.720–3.730
www.courtinfo.ca.gov

American LegalNet, Inc.
www.FormsWorkflow.com

35

P.32

AUG-29-2007  11:54

CM-110

| PLAINTIFF/PETITIONER: | CASE NUMBER: |
|---|---|
| DEFENDANT/RESPONDENT: | |

4. b. Provide a brief statement of the case, including any damages. (If personal injury damages are sought, specify the injury and damages claimed, including medical expenses to date (indicate source and amount), estimated future medical expenses, lost earnings to date, and estimated future lost earnings. If equitable relief is sought, describe the nature of the relief.)

☐ (If more space is needed, check this box and attach a page designated as Attachment 4b.)

5. Jury or nonjury trial
The party or parties request ☐ a jury trial ☐ a nonjury trial (If more than one party, provide the name of each party requesting a jury trial).

6. Trial date
   a. ☐ The trial has been set for (date):
   b. ☐ No trial date has been set. This case will be ready for trial within 12 months of the date of the filing of the complaint (if not, explain):

   c. Dates on which parties or attorneys will not be available for trial (specify dates and explain reasons for unavailability):

7. Estimated length of trial
The party or parties estimate that the trial will take (check one):
   a. ☐ days (specify number):
   b. ☐ hours (short causes) (specify):

8. Trial representation (to be answered for each party)
The party or parties will be represented at trial ☐ by the attorney or party listed in the caption ☐ by the following:
   a. Attorney:
   b. Firm:
   c. Address:
   d. Telephone number:
   e. Fax number:
   f. E-mail address:
   g. Party represented:
   ☐ Additional representation is described in Attachment 8.

9. Preference
   ☐ This case is entitled to preference (specify code section):

10. Alternative Dispute Resolution (ADR)
   a. Counsel ☐ has ☐ has not provided the ADR information package identified in rule 3.221 to the client and has reviewed ADR options with the client.
   b. ☐ All parties have agreed to a form of ADR. ADR will be completed by (date):
   c. ☐ This case has gone to an ADR process (indicate status):

CM-110 [Rev. January 1, 2007]    **CASE MANAGEMENT STATEMENT**    Page 2 of 4

36

CM-110

| PLAINTIFF/PETITIONER: | CASE NUMBER: |
|---|---|
| DEFENDANT/RESPONDENT: | |

10. d    The party or parties are willing to participate in *(check all that apply)*:

    (1) ☐ Mediation

    (2) ☐ Nonbinding judicial arbitration under Code of Civil Procedure section 1141.12 *(discovery to close 15 days before arbitration under Cal. Rules of Court, rule 3.822)*

    (3) ☐ Nonbinding judicial arbitration under Code of Civil Procedure section 1141.12 *(discovery to remain open until 30 days before trial; order required under Cal. Rules of Court, rule 3.822)*

    (4) ☐ Binding judicial arbitration

    (5) ☐ Binding private arbitration

    (6) ☐ Neutral case evaluation

    (7) ☐ Other *(specify)*:

    e. ☐ This matter is subject to mandatory judicial arbitration because the amount in controversy does not exceed the statutory limit.

    f. ☐ Plaintiff elects to refer this case to judicial arbitration and agrees to limit recovery to the amount specified in Code of Civil Procedure section 1141.11.

    g. ☐ This case is exempt from judicial arbitration under rule 3.811 of the California Rules of Court *(specify exemption)*:

**11. Settlement conference**

    ☐ The party or parties are willing to participate in an early settlement conference *(specify when)*:

**12. Insurance**

    a. ☐ Insurance carrier, if any, for party filing this statement *(name)*:

    b. Reservation of rights:    ☐ Yes    ☐ No

    c. ☐ Coverage issues will significantly affect resolution of this case *(explain)*:

**13. Jurisdiction**

    Indicate any matters that may affect the court's jurisdiction or processing of this case, and describe the status.

    ☐ Bankruptcy    ☐ Other *(specify)*:

    Status:

**14. Related cases, consolidation, and coordination**

    a. ☐ There are companion, underlying, or related cases.

        (1) Name of case:

        (2) Name of court:

        (3) Case number:

        (4) Status:

    ☐ Additional cases are described in Attachment 14a.

    b. ☐ A motion to    ☐ consolidate    ☐ coordinate    will be filed by *(name party)*:

**15. Bifurcation**

    ☐ The party or parties intend to file a motion for an order bifurcating, severing, or coordinating the following issues or causes of action *(specify moving party, type of motion, and reasons)*:

**16. Other motions**

    ☐ The party or parties expect to file the following motions before trial *(specify moving party, type of motion, and issues)*:

CM-110 [Rev. January 1, 2007]                    **CASE MANAGEMENT STATEMENT**                    Page 3 of 4

**37**

CM-110

| PLAINTIFF/PETITIONER: | CASE NUMBER: |
|---|---|
| DEFENDANT/RESPONDENT: | |

17. **Discovery**
  a. ☐ The party or parties have completed all discovery.
  b. ☐ The following discovery will be completed by the date specified (describe all anticipated discovery):

    **Party**             **Description**             **Date**

  c. ☐ The following discovery issues are anticipated (specify):

18. **Economic Litigation**
  a. ☐ This is a limited civil case (i.e., the amount demanded is $25,000 or less) and the economic litigation procedures in Code of Civil Procedure sections 90 through 98 will apply to this case.
  b. ☐ This is a limited civil case and a motion to withdraw the case from the economic litigation procedures or for additional discovery will be filed (if checked, explain specifically why economic litigation procedures relating to discovery or trial should not apply to this case):

19. **Other Issues**
  ☐ The party or parties request that the following additional matters be considered or determined at the case management conference (specify):

20. **Meet and confer**
  a. ☐ The party or parties have met and conferred with all parties on all subjects required by rule 3.724 of the California Rules of Court (if not, explain):

  b. After meeting and conferring as required by rule 3.724 of the California Rules of Court, the parties agree on the following (specify):

21. **Case management orders**
  Previous case management orders in this case are (check one): ☐ none ☐ attached as Attachment 21.

22. Total number of pages attached (if any): _____

I am completely familiar with this case and will be fully prepared to discuss the status of discovery and ADR, as well as other issues raised by this statement, and will possess the authority to enter into stipulations on these issues at the time of the case management conference, including the written authority of the party where required.

Date:

▶
_____
(TYPE OR PRINT NAME)              (SIGNATURE OF PARTY OR ATTORNEY)

▶
_____
(TYPE OR PRINT NAME)              (SIGNATURE OF PARTY OR ATTORNEY)
                                   ☐ Additional signatures are attached

CM-110 [Rev. January 1, 2007]       **CASE MANAGEMENT STATEMENT**       Page 4 of 4

AUG-29-2007  11:34

P.35

# NOTICE

## SONOMA COUNTY SUPERIOR COURT
## CIVIL DIVISION PRO TEM JUDGE PROGRAM

This is to advise that the Civil Division's Pro Tem Judge Program is available to those civil litigants who wish to expedite trial by stipulating to the use of an attorney to serve as Pro Tem Judge. The court maintains a Pro Tem Judge panel, which consists of attorneys sworn by the Court and willing to serve in this capacity. Parties may stipulate to a trial by a Pro Tem Judge of their choice and may inform the Court of such a stipulation by contacting Connie Origer, the Pro Tem Judge Program Coordinator, at (707) 565-6430.

The Program offers three primary benefits to litigants: (1) the date and location of trial can often be scheduled by stipulation of the parties; (2) the trial will take place on the agreed date for trial, thus eliminating the need to trail other cases; and; (3) the trial can be scheduled for full days on a 5 day per week basis, thus shortening the time to try the case. The Program is available for both jury and court trials.

For cases that are tried in 5 days or less (9:00 a.m. to 5:00 p.m., jury or non-jury), the Pro Tem Judge serves at no cost to the parties. For trials that exceed 5 days in length, the parties and the Pro Tem Judge are obliged to agree to a daily fee, not to exceed $1,200 per day, for each full or partial day of trial beginning with the 6th day of trial. Additionally, the Court will charge the parties $656.72 for each day of trial for the Clerk and Court Reporter. The Court discourages the use of overtime and will charge an additional cost of $123.14 for each hour or portion thereof exceeding 8 hours in any day. The parties are also responsible for the payment of jury fees as in any other civil case. Cases in which there are fee waivers are eligible for the Program.

The Court is enthusiastic about this Program and urges all counsel to discuss the availability of the Program and the feasibility of its use with opposing counsel. Counsel must also obtain permission from clients to participation in the Program. To participate in the Program, contact Ms. Origer as soon as possible to discuss trial dates. Ms. Origer will generate and mail all required stipulations and orders with respect to the Program. Parties may obtain additional information on this program by contacting Ms. Origer or by reviewing the court's website at www.sonomasuperiorcourt.com.

Plaintiff is ordered to serve this Notice on all parties and to certify by proof of service filed with the Court that such service has been accomplished within 60 days of the filing of the Complaint.

---

CV-41, New 1/1/07    PETALUMA PRO TEM JUDGE PROGRAM NOTICE

| ATTORNEY OR PARTY WITHOUT ATTORNEY (Name & Address): | FOR COURT USE ONLY |
|---|---|
| Telephone No.:                        FAX No.:<br><br>ATTORNEY FOR (Name):                        Bar No.<br><br>**SUPERIOR COURT OF CALIFORNIA, COUNTY OF SONOMA**<br>600 Administration Drive<br>Santa Rosa, CA 95403<br>Telephone: (707) 521-6500 | |
| PLAINTIFF(S)/PETITIONER(S): | |
| DEFENDANT(S)/RESPONDENT(S): | CASE NUMBER: |

### NOTICE OF SELECTION AS MEDIATOR IN COURT-CONNECTED MEDIATION
(Sonoma County Superior Court Local Rule 16)

Name of Mediator Selected: _____

   **PLEASE TAKE NOTICE** that the above-referenced matter is subject to Sonoma County Superior Court Local Rule 16 (Rules Applicable to Alternative Dispute Resolution (ADR)). The parties have selected you to serve as the mediator in this matter. Sonoma County Superior Court has a voluntary, market rate mediation program. All mediations conducted in cases covered by Local Rule 16 are court-connected mediations and are subject to the provisions of California Rules of Court, Rules 3.850 et seq. It is your obligation to familiarize yourself with Local Rule 16 and California Rules of Court, Rules 3.850 et seq., before the mediation. **PLEASE NOTE:** you are required to have the parties complete an Attendance Sheet for Court-Program Mediation of Civil Case (Alternative Dispute Resolution) (Judicial Council form ADR-107) in accordance with California Rules of Court Rule 3.860. The form is available at the web site of the California Courts www.courtinfo.ca.gov.

   If you **are not** a member of the Sonoma County Superior Court panel of mediators, in order to serve as mediator in this case, you **must** complete the acceptance below (see CRC Rule 3.851(a) (2)), sign it in the space provided, and file the completed Notice with your *original signature* with the Court not less than five days before commencement of the mediation. Please also provide a courtesy copy of the completed and signed Notice to the ADR Program Coordinator, 1450 Guerneville Road, Building G, Santa Rosa, California 95403 or by facsimile transmission to (707) 565-7059.

   If you are mediating a case referred to court-connected mediation during calendar year 2007, regardless of the date of the mediation, you are required to complete and return a Mediator's Questionnaire (Sonoma County Superior Court Local form CV-36) within five (5) days after completion or other termination of the mediation. The completed questionnaire may be mailed or faxed to ADR Program Coordinator at the above address or FAX number. The plaintiff should provide the Mediator's Questionnaire to you. The questionnaire is also available on the web site of the Sonoma County Superior Court www.sonomasuperiorcourt.com.

   If you have any questions regarding your selection or service as a mediator in this matter or about the Sonoma County Superior Court ADR Program, please feel free to contact the ADR Program Coordinator at (707) 565-7000 or ADR@sonomacourt.org.

### MEDIATOR'S ACCEPTANCE

I, _____ hereby agree to mediate the above-captioned matter subject to
            (print name)

the conditions stated in this notice.

Dated: _____        _____
                                              (Mediator's Signature)

CV-35(New. 1/1/07)    **NOTICE OF SELECTION AS MEDIATOR IN COURT-CONNECTED MEDIATION**    Page 1 of 1

Best's Insurance Reports - Life Health, US, 2007 Edition (2006 Annual Data, Version 2007.1)    Page 1
06664 - The Lincoln National Life Insurance Company

**Group Affiliation: Lincoln Financial Group**

# THE LINCOLN NATIONAL LIFE INSURANCE COMPANY

**1300 South Clinton Street, Fort Wayne, Indiana, United States 46802-3518**
Web: www.lfg.com

Tel:  260-455-2000                                          Fax:  260-455-4140
AMB#:  06664                                                NAIC#:  65676
FEIN#:  35-0472300

**Publicly Traded Corporation: Lincoln National Corporation**
**NYSE: LNC**

# BEST'S RATING

Based on our opinion of the consolidated Financial Strength of the life/health members of Lincoln Financial Group, which operate under a group structure, this group member is assigned a Best's Rating of A+ (Superior). The company is assigned the Financial Size Category of Class XV which is the Financial Size Category of the parent.

# RATING RATIONALE

**Rating Rationale:** The rating of The Lincoln National Life Insurance Company and its insurance affiliates, First Penn-Pacific Life Insurance Company, Lincoln Life & Annuity Company of New York and the former operating entities of Jefferson-Pilot (JP) Corporation (together referred to as Lincoln Financial Group, LFG), reflects LFG's prominent position in the wealth management and asset accumulation marketplace, its diversified earnings sources, positively trending sales, high-quality investment portfolio, solid business profile and strong enterprise risk management practices. The rating also reflects the increased scale of the consolidated group, LFG's market position as a top-five provider of variable annuities, and its diversified operating profile, which has reduced exposure to equity market volatility due to the addition of JP. Additionally, LFG has produced strong sales results in life insurance and annuities and has made significant progress in achieving its merger-related expense synergies and integration goals. These strengths are partially offset by LFG's elevated intangibles relative to its consolidated GAAP capital base as well as its higher financial leverage and projected slight decline in fixed charge coverage over the near to medium term. A.M. Best expects these measures to improve upon completion of the remaining integration tasks and future realization of expense synergies. Current capitalization is sound, but is likely to level off going forward as organic earnings growth will be utilized for significant share buybacks over the next three years.

LFG is a leading asset manager and innovative life and annuity product manufacturer with sophisticated asset/liability and enterprise risk management practices. LFG ranks among the industry's leading writers of ordinary life insurance with a focus on term, VUL and UL, and maintains a solid position in the retirement savings sector as a leading writer of both qualified and non-qualified fixed and variable annuities. LFG's revenues, earnings and cash flows are further diversified through its Delaware Investments and Lincoln Financial Media subsidiaries. LFG's asset management business has benefited historically from solid investment performance, particularly on the retail side. In recent years, LFG has also enjoyed strong growth in variable annuity sales and has developed comprehensive financial and risk management practices to address the living benefit features associated with these products. LFG continues to make progress in expanding its distribution capabilities, particularly within its wholesaler channel, Lincoln Financial Distributors. A.M. Best notes that LFG's fee-based financial planner channel, Lincoln Financial Network, has contracted in recent years as part of its renewed focus on retaining high-quality producers. A.M. Best believes that the group's broad product portfolio -- encompassing both variable and fixed products -- combined with its strategy of targeting the upper-income market segment and its strong top-line sales growth should facilitate positive earnings momentum going forward.

As a top-five seller of variable annuities, LFG's earnings profile is highly correlated to equity market performance, though overall equity market volatility has been reduced with the addition of JP. The merger also brought with it a sizable block of no-lapse universal life policies. Consequently, LFG is likely to seek a long-term solution for funding the statutory reserves required for this business, which currently represents the majority of life sales. A.M. Best notes that a significant portion of Lincoln's fixed annuity block is rolling off as multi-year guarantees expire. However, the impact on the group's overall liquidity and earnings profile will likely be immaterial. Merger execution risk is substantially diminished, but a number of integration tasks remain including optimization of its legal entity structure, realization of remaining merger savings, adoption of a fully unified life and annuity product portfolio and, most importantly, completion of company-wide systems integration efforts. Additionally, while Lincoln's asset management business remains a competitive strength, both its retail and institutional businesses recently experienced a decline in net flow, due partially to popular investment funds reaching capacity. Although LFG will be challenged over time to retain members of its institutional investment management team, the impact of potential team disruption is not expected to be material in the short term. Also, the company is taking steps to address its institutional fixed income capabilities. Finally, while LFG continues to grow its Employer Markets segment, A.M. Best believes its business profile is still developing as it faces significant competition from other major players in this arena.

Best's Rating: A+ g                                                              Outlook: Stable

# FIVE YEAR RATING HISTORY

Copyright © 2007, A.M. Best Company. All Rights Reserved.
Reproduction and distribution of A.M. Best data to third parties is strictly
prohibited without express written consent. Visit the A.M. Best website at
http://www.ambest.com for the latest Best's Ratings and Best's Company Reports.

**41**

# EXHIBIT B

Best's Insurance Reports - Life Health, US, 2007 Edition (2006 Annual Data, Version 2007.1)
06864 - The Lincoln National Life Insurance Company

Page 2

| Date | Best's Rating |
|------|---------------|
| 03/28/07 | A+ g |
| 04/03/06 | A+ g |
| 10/10/05 | A+ g |
| 11/19/04 | A+ g |
| 05/18/04 | A+ g |
| 10/09/03 | A+ g |
| 06/20/03 | A+ g |
| 06/11/02 | A+ g |

## KEY FINANCIAL INDICATORS
### (in thousands of dollars)

| Year | Assets | Total Capital Capital Surplus Funds | Condit'l Reserve Funds | Net Premiums Written | Net Invest Income | Net Income |
|------|--------|------------|---------|----------|--------|--------|
| 2001 | 73,936,122 | 3,095,975 | 454,507 | 7,394,819 | 2,128,410 | 67,709 |
| 2002 | 67,123,506 | 2,628,111 | 264,491 | 8,229,405 | 2,119,951 | -284,920 |
| 2003 | 78,176,256 | 2,786,697 | 221,577 | 8,456,250 | 2,101,646 | 234,774 |
| 2004 | 87,081,133 | 2,961,192 | 293,181 | 11,328,946 | 2,095,708 | 242,090 |
| 2005 | 95,380,517 | 3,214,716 | 350,327 | 11,708,759 | 2,102,688 | 494,319 |
| 2006 | 106,799,102 | 3,035,342 | 457,997 | 13,867,850 | 2,033,177 | 224,140 |
| 03/2006 | 98,816,484 | 3,150,552 | 382,630 | 3,280,849 | 505,468 | 59,976 |
| 03/2007 | 106,414,762 | 3,077,115 | 486,964 | 3,786,652 | 482,315 | 145,284 |

## BUSINESS REVIEW

Lincoln National Life Insurance Company (LNL) is the lead company within Lincoln National Corporation (LNC), a financial services holding company based in Philadelphia. LNC reported approximately $178 billion of consolidated assets, $12.2 billion of shareholders' equity with total assets under management in excess of $164 billion at year-end 2006. The Lincoln companies, which operate under the marketing name Lincoln Financial Group (LFG), focus on wealth accumulation, estate planning and protection products for the high net-worth and small business market. The primary operating subsidiaries that are ultimately owned by LNC are LNL, First Penn-Pacific Life Insurance Company (First Penn), Lincoln Life & Annuity Company of New York (Lincoln Life NY), Lincoln-JP Holdings LP, Lincoln National Investments and Lincoln National UK (Lincoln UK). In addition, LNL's corporate structure includes two offshore reinsurance entities which reinsure intercompany LNL life business -- Lincoln National Reinsurance Co. (Barbados) and Lincoln Reinsurance Company of Bermuda, Ltd. Lincoln-JP was formed in April 2006 as a result of LFG's merger with Jefferson Pilot, which was comprised of a number of operating subsidiaries including Jefferson-Pilot Life Insurance Company (JP Life), Jefferson Pilot Financial Insurance Company (JP Financial) and Jefferson Pilot LifeAmerica Insurance Company (JPLA) as well as the former Jefferson-Pilot Communications Company (renamed Lincoln Financial Media), a non-insurance entity which specializes in radio and TV broadcasting. JP Life and JPLA were recently merged into LNL and Lincoln Life NY, respectively. LFG enjoys a top five market position based on variable annuity assets and a top ten market position based on ordinary life premiums written with a solid competitive franchise in universal life, variable universal life, variable annuities and fixed annuities including indexed annuities. LFG reports its results in five business segments; Individual Markets, Employer Markets, Investment Management, Lincoln UK, Lincoln Financial Media and a sixth non operating segment entitled "other" operations which includes its corporate results.

LFG's competitive foothold has been strengthened considerably within its Individual Market segment which offers the following life related product lines; variable life, universal life, interest sensitive whole life, term, and LFG's proprietary MoneyGuard product which combines a universal life policy with a long-term care benefit. Within annuities, the Individual Market segment offers fixed (including indexed annuities) and variable annuities on a qualified and non qualified basis. Within life, LFG has an inforce of roughly $500 billion of which approximately 45% is term, 40% is non secondary guarantee universal life and the balance primarily in secondary guarantee universal life. This segment has a target market focus in the mass affluent to high net worth market which LFG typically defines as having a household net worth of $2.0 million or higher. Key profitability drivers for the individual segment include investment spreads, asset management and product related fees including mortality charges, persistency and effective expense management coupled with strong enterprise risk management practices. At year-end 2006, total annuity account values within the Individual Market segment were roughly $65 billion (net of reinsurance) of which approximately 25% was fixed annuities and 75% in variable annuities. In 2006, LFG ranked fifth in terms of assets associated with individual variable annuities (VAs) in the United States. Approximately 91% of LFG's VAs have a guaranteed minimum death benefit (GMDB) feature and approximately 26% have a guaranteed minimum withdrawal benefit (GMWB) feature. Within the last three years, LFG has introduced VAs with guaranteed minimum income benefit (GMIB) features that are sold under the marketing names i4Life Advantage and 4 Later Advantage which comprise approximately 6% of variable annuity account values as of year-end 2006.

Copyright © 2007, A.M. Best Company. All Rights Reserved.
Reproduction and distribution of A.M. Best data to third parties is strictly
prohibited without express written consent. Visit the A.M. Best website at
http://www.ambest.com for the latest Best's Ratings and Best's Company Reports.

LFG's Investment Management segment consists of Delaware Investments, which is located in Philadelphia. Delaware manages the general account and separate account for LFG's insurance entities, provides management and advisory services to institutional clients and offers a broad array of mutual funds, retirement plan services and other investment products, including managed accounts and Section 529 college savings plans. A core driver for this segment's earnings is asset management fees, which recently have been positively trending due to higher account balances as a result of favorable equity market returns, strong investment performance and historically positively net flows. During 2006 net flows on the retail side have declined due to a number of retail mutual funds which have reached maximum investment capacity. Institutional net flows have declined modestly though A.M. Best anticipates no material impact on operating earnings which are expected to improve due to higher margins which reflect solid expense management, strong equity market performance, and higher, albeit reduced net retail and institutional flows. Delaware's portfolio is well balanced amongst insurance related assets (40%), institutional (30%) and retail mutual funds (30%) with combined assets under management of $164 billion as of year end 2006. Delaware offers mutual funds and managed wrap accounts as well as investment management and account administration services for variable annuity products and 401(k), pension, endowment and trust accounts. Delaware's asset management expertise is well diversified amongst asset styles including large cap value, focus growth, international equities and emerging markets with solid investment performance rankings within its mutual funds and institutional funds.

LFG's Employer Market segment is newly created from JP's former Benefit Partners business and includes the following business lines; Defined Contribution (DC), Executive Benefits (EB), and Group Products (GP). LFG's DC business line markets fixed and variable annuity products to the defined contribution market with approximately $33.7 billion of assets under management including mutual funds. Additionally, LFG offers turnkey retirement services (administration, investments, employee education and compliance)) with a target market focus on healthcare, public/governmental, education, corporate and not-for-profits. The EB business line includes COLI/BOLI insurance and its GP business line sells group voluntary life, dental and disability products.

LFG's UK segment consists primarily of equity-linked trust accounts that are similar to U.S. variable life and annuity products. In prior years LFG's operating strategy for Lincoln UK was primarily asset retention based with a very limited range of new products using an outsourced administrative model. Recently, due to favorable regulatory changes in the U.K. LFG has indicated that it may expand its UK operations going forward.

LFG's final operating segment is Lincoln Financial Media (LFM) which lends diversification to LFG's operating platform through its radio, sports, and television advertising earnings associated with 18 radio and 3 television stations located in selective markets throughout the Southeastern and Western U.S. This segment is viewed as non core to the overall group, and in 2006 contributed approximately 3% of consolidated operating income.

LFG's distribution is focused through two major channels -- Lincoln Financial Distributors (LFD) and Lincoln Financial Network (LFN). The former employs a differentiated distribution model with LFD acting as the core provider of retail (i.e. Individual Markets) life, annuity and investment products to multiple distribution channels which include wirehouses, regional broker/dealers, marketing general agents, banks and independent planners (including LFN) with approximately 285 external wholesalers and 185 internal sales associates. LFN consists of approximately 4,000 independent financial planners operating primarily on a fee only basis in approximately 100 national offices and currently accounts for approximately 25% of LFG's life insurance sales. In recent years the number of Lincoln-related LFN planners has declined due to LFG's strategic decision to concentrate on top quality producers. Lincoln's life and annuity business is written through LNL, First Penn and Lincoln Life NY; LNL accounts for the substantial majority of total insurance company assets. First Penn is an Indiana corporation, headquartered in Schaumburg, Illinois. First Penn has a leading position in the term life and fixed annuity marketplace, developing customized products for multiple distribution channels. Lincoln Life NY offers fixed and variable annuities, universal and variable universal life, term life and other individual life products through the group's distribution channels in the state of New York.

A.M. Best notes that the merger of LNC with JP has reduced LFG's exposure to equity market volatility through the addition of non-insurance cash flows, the consolidation of JP's life block and its fixed annuity blocks. While a number of merger related integration steps remain which include consolidation of legal entities, consolidation of systems and development of a combined product manufacturing platform, LFG has demonstrated success in completing many major integration efforts within the past year and in realizing approximately one half of the $180 million pretax expected expense synergies from the merger. The group continues to employ solid enterprise risk management (ERM) practices throughout the organization which is evidenced by its solid hedging practices for variable annuities and a three pronged approach to ERM which focuses on three key areas: (1) Action-Oriented Risk Management --which complements existing front-end and back-end processes through innovative product design and flexible underwriting and pricing mechanisms within a risk management framework; (2) Economic Capital Model -- improvement of LFG's existing model to include stochastic modeling and create a weighted value-at-risk (VAR) measurement that will extend traditional forms of VAR to an embedded value-at-risk concept; (3) Refinement of ERM Reporting -- enhancement of quarterly reporting to incorporate a ratings-based assessment of each area's risk throughout the organization.

## PREMIUM AND RESERVE ANALYSIS

| Direct Premiums (000) | 2006 | 2005 | 2004 | 2003 | 2002 |
|---|---|---|---|---|---|
| Ordinary life | 1,802,410 | 1,702,105 | 1,680,025 | 1,642,527 | 1,318,619 |
| Group life | -130 | 237 | 280 | 114 | 3,991 |
| Individual annuities | 9,839,031 | 7,993,759 | 7,046,619 | 4,792,174 | 5,306,854 |
| Group annuities | 2,470,840 | 2,174,108 | 2,575,279 | 2,170,471 | 1,793,908 |
| Individual A&H | 33,455 | 34,994 | 37,096 | 38,480 | 41,960 |
| Group A&H | 138 | 559 | 3,433 | 2,311 | 7,914 |
| Total | 14,145,744 | 11,905,763 | 11,342,732 | 8,646,078 | 8,473,245 |

Copyright © 2007, A.M. Best Company. All Rights Reserved.
Reproduction and distribution of A.M. Best data to third parties is strictly
prohibited without express written consent. Visit the A.M. Best website at
http://www.ambest.com for the latest Best's Ratings and Best's Company Reports.

| Reins Assumed Prems (000) | 2006 | 2005 | 2004 | 2003 | 2002 |
|---|---|---|---|---|---|
| Ordinary life | 1,612,494 | 1,637,717 | 1,718,989 | 1,885,790 | 1,789,863 |
| Group life | 11,669 | 8,330 | 21,511 | 41,758 | 45,157 |
| Credit life | 20,365 | 28,626 | 36,925 | 53,481 | 58,784 |
| Individual annuities | 3,672 | 3,076 | 2,201 | 3,138 | 4,327 |
| Group annuities | 1,702 | 807 | 6,142 | 5,649 | 7,050 |
| Individual A&H | 99,198 | 102,889 | 119,545 | 129,938 | 157,674 |
| Credit A&H | 47,501 | 5,273 | 29,464 | ... | 83,502 |
| Group A&H | -1,911 | 35,846 | -5,345 | 88,443 | 328,764 |
| Total | 1,794,692 | 1,822,563 | 1,929,432 | 2,208,196 | 2,475,121 |

| Reins Ceded Prems (000) | 2006 | 2005 | 2004 | 2003 | 2002 |
|---|---|---|---|---|---|
| Ordinary life | 1,696,979 | 1,652,316 | 1,566,777 | 1,610,040 | 1,380,381 |
| Group life | 11,428 | 8,083 | 21,270 | 42,402 | 49,731 |
| Credit life | 20,365 | 28,626 | 36,925 | 53,481 | 58,123 |
| Individual annuities | 164,747 | 151,117 | 126,142 | 429,262 | 609,090 |
| Group annuities | 677 | 363 | 11,269 | 6,408 | 6,202 |
| Individual A&H | 132,646 | 137,875 | 156,632 | 168,194 | 199,797 |
| Credit A&H | 47,501 | 5,277 | 29,465 | ... | 82,093 |
| Group A&H | -1,758 | 35,909 | -5,263 | 88,237 | 333,544 |
| Total | 2,072,586 | 2,019,566 | 1,943,217 | 2,398,024 | 2,718,961 |

| Net Premiums & Deposits (000) | 2006 | 2005 | 2004 | 2003 | 2002 |
|---|---|---|---|---|---|
| Ordinary life | 1,727,477 | 1,687,505 | 1,832,237 | 1,918,277 | 1,728,100 |
| Group life | 111 | 484 | 521 | -530 | -584 |
| Credit life | ... | ... | ... | ... | 661 |
| Individual annuities | 9,679,117 | 7,845,718 | 6,922,678 | 4,827,728 | 4,702,091 |
| Group annuities | 3,508,004 | 3,195,862 | 3,522,005 | 2,399,143 | 2,119,968 |
| Individual A&H | 7 | 8 | 9 | 224 | -163 |
| Credit A&H | ... | -4 | -1 | ... | 1,409 |
| Group A&H | -15 | 496 | 3,351 | 2,517 | 3,134 |
| Total | 14,914,701 | 12,730,070 | 12,280,798 | 9,147,359 | 8,554,618 |
| Deposits (incl. above) | 1,046,852 | 1,021,310 | 951,852 | 691,109 | 325,213 |

General Account

| Reserve Distribution (000) | 2006 | 2005 | 2004 | 2003 | 2002 |
|---|---|---|---|---|---|
| Ordinary life | 12,616,661 | 11,672,407 | 11,224,645 | 10,465,708 | 9,720,584 |
| Group life | 393 | 412 | 434 | 453 | 396 |
| Supplementary contracts | 9,453 | 10,413 | 11,888 | 14,280 | 16,304 |
| Individual annuities | 13,289,010 | 14,816,520 | 15,273,499 | 15,222,819 | 15,488,796 |
| Group annuities | 6,268,360 | 5,977,389 | 5,823,697 | 5,503,467 | 4,461,468 |
| Deposit type contracts | 607,776 | 614,961 | 655,472 | 667,844 | 583,905 |
| Individual A&H | ... | 613 | 613 | 613 | 613 |
| Group A&H | 99,460 | 109,743 | 119,364 | 140,720 | 119,031 |
| Total | 32,891,113 | 33,202,458 | 33,109,612 | 32,015,905 | 30,391,097 |

**Current Year Geographic Direct Premium Distribution ($000):** California, $1,970,453 (13.9%); Florida, $1,061,988 (7.5%); Texas, $856,041 (6.1%); Indiana, $739,326 (5.2%); Ohio, $638,595 (4.5%); other jurisdictions, $8,874,832 (62.8%).

# EARNINGS

LNC's statutory operating earnings declined significantly from the prior year due to significant statutory strain from robust levels of UL sales with secondary guarantees, strong variable annuity sales, ongoing spread compression on interest-sensitive life and annuity products, lower investment income associated with higher levels of insurance company dividends for share buybacks and higher levels of incentive compensation expense. On

Copyright © 2007, A.M. Best Company. All Rights Reserved.
Reproduction and distribution of A.M. Best data to third parties is strictly
prohibited without express written consent. Visit the A.M. Best website at
http://www.ambest.com for the latest Best's Ratings and Best's Company Reports.

the positive side, statutory earnings benefited from the inclusion of almost three quarters of income from JP's insurance operations, modest improvement in investment spreads and higher insurance-related fees due to higher account values within variable annuities.

In 2006, LFG's GAAP earnings benefited from enhanced fee income driven by strong equity market performance, strong growth in variable annuity and universal life sales, and positive net flows in retail and institutional asset management (albeit reduced from prior year levels). Additionally, and most significantly, GAAP earnings benefited from the inclusion of JP's operating results and a modestly favorable insurance recovery in LNC's UK operations. These positives were offset by higher capital financing costs associated with the merger of JP with LNC in April 2006 and various GAAP reserve and asset adjustments, higher incentive compensation and higher reserve levels for UL with secondary guarantees coupled with approximately $49 million of integration related expenses.

Going forward, A.M. Best expects that statutory and GAAP earnings will improve as LNC achieves its targeted $180 million of pre-tax expense efficiencies from the merger and as earnings emerge from significant growth in life and annuity sales. These trends will be somewhat mitigated by loss of investment income attributable to increased share buybacks and lower fixed annuity income associated with the roll-off of LNC's multi-year fixed annuities. A.M. Best expects the impact on earnings from the fixed annuity roll-off to be relatively insignificant. A.M. Best notes that LNC's earnings profile has been enhanced by the scale of JP's life, annuity and group benefits business with an overall increase in earnings diversification and lower exposure to equity market volatility. Going forward, A.M. Best expects statutory and GAAP operating returns in the range of low-to-mid teens.

## PROFITABILITY TESTS

| Year | Ben Paid to NPW & Dep | Comm & Exp to NPW & Dep | NOG to Tot Assets | NOG to Tot Rev | Operating Return on Equity | Net Yield | Total Return |
|------|------|------|------|------|------|------|------|
| 2002 | 93.9 | 15.7 | 0.0 | -0.2 | -0.7 | 6.43 | 5.27 |
| 2003 | 79.8 | 14.0 | 0.5 | 3.2 | 13.9 | 6.14 | 6.10 |
| 2004 | 66.2 | 11.6 | 0.2 | 1.3 | 6.3 | 5.82 | 6.19 |
| 2005 | 70.2 | 11.9 | 0.5 | 3.1 | 15.1 | 5.69 | 5.68 |
| 2006 | 72.2 | 10.3 | 0.2 | 1.4 | 7.6 | 5.55 | 5.78 |
| 03/2006 | 77.9 | 11.3 | 0.1 | 1.6 | 2.0 | 1.34 | 1.39 |
| 03/2007 | 80.4 | 10.6 | 0.1 | 2.9 | 4.2 | 1.36 | 1.01 |

## PROFITABILITY ANALYSIS

| Net Operating Gain (000) | 2006 | 2005 | 2004 | 2003 | 2002 |
|------|------|------|------|------|------|
| Ordinary life | -78,613 | 147,298 | -84,231 | 82,247 | 210,149 |
| Group life | -153 | 27 | -218 | -1,260 | -2,759 |
| Credit life | ... | 0 | ... | 156 | 688 |
| Supplementary contracts | -595 | 200 | 867 | -198 | -96 |
| Individual annuities | 264,158 | 229,772 | 200,116 | 197,920 | -41,589 |
| Group annuities | 55,150 | 53,241 | 54,159 | 13,940 | 39,578 |
| Individual A&H | 855 | 568 | 486 | -10,534 | -5,247 |
| Credit A&H | ... | -2 | 3 | -949 | -26 |
| Group A&H | 105 | 120 | 122 | -137 | 409 |
| Other | -4,627 | 36,320 | 10,006 | 94,113 | -222,420 |
| Total | 236,280 | 467,544 | 181,308 | 375,298 | -21,314 |

## CAPITALIZATION

During 2006, the group's statutory capital declined moderately with lower statutory earnings and higher dividends partially offset by an increase in the asset valuation reserve. Statutory earnings declined due to strong sales in life and annuity lines which resulted in statutory strain, merger related expense charges, and higher compensation expenses. In the first quarter of 2007, LFG announced and executed $500 million in common share repurchase. A.M. Best expects the company to have regular share repurchase activity since the company added $2 billion of capacity in 2007. Stock buybacks will be funded primarily through dividends from LFG's life and non-life entities. Hence, A.M. Best expects capital levels to be stable, with organic earnings growth offset by higher shareholder dividends. A key variable in expected capital trends will be evolving reserve requirements related to no-lapse UL policies, which represents a significant portion of current year sales and a growing proportion of its insurance reserves.

The operating companies' capital needs are supported by LFG, which has ready access to the capital markets. LFG has historically maintained a

Copyright © 2007. A.M. Best Company. All Rights Reserved.
Reproduction and distribution of A.M. Best data to third parties is strictly
prohibited without express written consent. Visit the A.M. Best website at
http://www.ambest.com for the latest Best's Ratings and Best's Company Reports.

Best's Insurance Reports - Life Health, US, 2007 Edition (2006 Annual Data, Version 2007.1)    Page 6
06654 - The Lincoln National Life Insurance Company

prudent level of financial leverage with strong interest coverage and good financial flexibility. The group's adjusted financial leverage is roughly 22%, incorporating equity credit for capital securities. A.M. Best expects LFG's adjusted debt-to-capital ratio to remain at or below 25% in the near to medium term, with continued strong interest coverage. A.M. Best notes that the company has lowered its merger related financing costs by redeeming higher coupon securities and replacing them with lower cost senior debt and hybrid securities. Going forward, A.M. Best expects that hybrid securities, which currently represent approximately 7% of LFG's capital structure, will be maintained at or below 15% of its total capital.

Prospectively, LFG will need to consider potential capital markets solutions to fund Regulation AXXX (AG 38) reserves associated with its significant secondary guarantee UL (SGUL) business. A.M. Best notes that LFG is currently exploring a number of options to address this issue through a permanent financing transaction which will remove rollover risk associated its current letter of credit (LOC) strategy. Additionally, there is future regulatory uncertainty regarding potential reserving methodology changes associated with AG 38 as well as the lack of long-term historical experience related to secondary guarantees in general, which could constrain the rate of future capital formulation. Finally, on a qualitative basis, the group's quality of capital is dampened by a relatively high amount of goodwill and other intangible assets on LFG's balance sheet, including roughly $3.4 billion created from the JP transaction.

## LEVERAGE TESTS

| Year | C&S to Liabilities | Surplus Relief | Reins Leverage | NPW & Dep to Capital | Change in NPW & Dep | Change in Capital |
|------|------|------|------|------|------|------|
| 2002 | 8.9 | 17.4 | 262.3 | 3.0 | 15.6 | -18.5 |
| 2003 | 8.7 | 16.5 | 302.4 | 3.0 | 6.9 | 4.0 |
| 2004 | 9.1 | 11.5 | 304.2 | 3.8 | 34.3 | 8.2 |
| 2005 | 10.0 | 9.8 | 282.1 | 3.6 | 3.7 | 9.5 |
| 2006 | 10.0 | 9.9 | 321.4 | 4.3 | 17.2 | -2.0 |
| 03/2006 | 9.9 | 0.9 | XX | 0.9 | 11.2 | -0.9 |
| 03/2007 | 11.1 | 0.9 | XX | 1.1 | 15.4 | 2.0 |

2006 BCAR: 181

## SOURCES OF CAPITAL GROWTH
### (in thousands of dollars)

| Year | Net Gain | Realized Capital Gains | Unrealized Capital Gains | Change AVR | Other Changes | Change in C&S |
|------|------|------|------|------|------|------|
| 2002 | -21,314 | -263,605 | -108,422 | 190,017 | -264,539 | -467,864 |
| 2003 | 375,298 | -140,525 | 100,352 | 42,914 | -219,454 | 158,586 |
| 2004 | 181,308 | 60,781 | 61,328 | -71,605 | -57,318 | 174,495 |
| 2005 | 467,544 | 26,775 | -35,112 | -57,146 | -148,537 | 253,525 |
| 2006 | 236,280 | -12,140 | 98,472 | -107,670 | -394,317 | -179,374 |
| 03/2006 | 64,471 | -4,495 | 26,645 | XX | XX | XX |
| 03/2007 | 129,397 | 15,887 | -139,258 | XX | XX | XX |

## CAPITAL TRENDS
### (in thousands of dollars)

| Year | Year end C&S | Surplus Notes | Stock-holder Divs | Policy-holder Divs | Asset Valuation Reserve | Interest Maintenance Reserve |
|------|------|------|------|------|------|------|
| 2002 | 2,628,111 | 1,250,000 | 710,000 | 71,216 | 264,491 | ... |
| 2003 | 2,786,697 | 1,250,000 | 200,000 | 76,955 | 221,577 | 110,021 |
| 2004 | 2,961,192 | 1,250,000 | 150,000 | 71,755 | 293,181 | 119,893 |
| 2005 | 3,214,716 | 1,250,000 | 200,000 | 71,908 | 350,327 | 121,075 |
| 2006 | 3,035,342 | 1,250,000 | 350,000 | 65,045 | 457,997 | 150,286 |
| 03/2006 | 3,150,552 | XX | 100,000 | 16,030 | 382,630 | 122,888 |
| 03/2007 | 3,077,115 | XX | 75,000 | 11,997 | 486,964 | 170,215 |

Copyright © 2007, A.M. Best Company. All Rights Reserved.
Reproduction and distribution of A.M. Best data to third parties is strictly
prohibited without express written consent. Visit the A.M. Best website at
http://www.ambest.com for the latest Best's Ratings and Best's Company Reports.

Best's Insurance Reports - Life Health, US, 2007 Edition (2006 Annual Data, Version 2007.1)    Page 7
06864 - The Lincoln National Life Insurance Company

# INVESTMENTS AND LIQUIDITY

LFG's Investment Management segment has been consolidated under the management of Lincoln's subsidiary, Delaware Management Holdings, Inc. (Delaware). Delaware manages the insurance assets of the Lincoln companies as well as external assets for retail and institutional clients in the United States and certain foreign countries.

Delaware's objective in managing Lincoln's general account assets is to maximize after-tax GAAP income in a manner consistent with the long-term preservation of capital. Lincoln has established a strong risk management hierarchy headed by a steering committee which includes the CEO and CFO. Several years ago, LFG implemented a dynamic hedging strategy for guaranteed benefit features (GMDB, GMWB and GMIB) on its variable annuities and currently hedges market (delta), volatility (vega) and interest (rho) risk. While no hedging program can eliminate all risks such as basis risk, tail risk and the impact of future policyholder behavior, A.M. Best believes that LFG's program is well-designed. A.M. Best notes that its hedges performed as expected during a recent (February 2007) market decline.

Liquidity and investment decisions are closely monitored with support from Delaware's fixed income research division. The company's liquidity needs are supported by LFG's access to the capital markets and its credit lines. In recent years, LFG has experienced some spread compression on its interest-sensitive life and annuity liabilities due to relatively low reinvestment yields, which have been partially offset by mortgage-backed prepayment gains (although LFG's exposure to mortgage-backed securities has been maintained at lower levels throughout this cycle). Nevertheless, like many companies, LFG has benefited from the fairly benign credit environment and the improving U.S. economy. The overall quality of LFG's general account portfolio has improved in recent years due to lower levels of below investment grade bonds and other invested assets, the addition of JP's investments, as well as the restructuring of its CDO portfolio to superior credit structures and reduced concentration of high-yield CBO investments. LFG continues to maintain its target average credit quality of A.

Lincoln segments its corporate investment portfolios along product lines to manage liquidity, interest rate and other risks in relation to the cash flow requirements of the liabilities. Liquidity is supported by a diversified investment portfolio consisting primarily of bonds, with the substantial majority of these rated investment quality or higher. Lincoln monitors the overall liquidity needs of each segmented investment portfolio as part of its ongoing asset-liability risk management process. The company seeks to improve yield through prudent allocations to below investment grade bonds, private placements, commercial mortgages and asset-backed securities.

Due to its focus on interest-sensitive products, Lincoln National Life is exposed to a relatively high degree of interest rate risk. The group mitigates its interest rate risk through an extensive derivative securities program. Interest rate caps are used to hedge against sustained rises in interest rates, and exchange-traded futures and options are purchased and sold to manage the duration characteristics of a portion of its fixed income securities portfolio. LFG also periodically uses foreign exchange contracts to mitigate the risks associated with changes in foreign currency rates in connection with its UK operations. While some risks are inherent in derivative securities, A.M. Best believes that these contracts are used in the context of a well-conceived, enterprise-wide risk management approach.

## LIQUIDITY TESTS

| Year | Operating Cash Flow ($000) | Quick Liquidity | Current Liquidity | Non-Inv Grade Bonds to Capital | Delnq & Foreclsd Mtg to Capital | Mtg & Cred Ten Lns & RE to Cap | Affil Invest to Capital |
|------|------|------|------|------|------|------|------|
| 2002 | 227,990 | 42.2 | 58.0 | 69.1 | 0.1 | 138.4 | 25.2 |
| 2003 | 1,885,046 | 43.1 | 59.6 | 68.2 | 0.0 | 128.1 | 26.1 |
| 2004 | 1,353,935 | 44.3 | 61.3 | 58.4 | ... | 110.5 | 26.9 |
| 2005 | 392,953 | 49.0 | 66.0 | 66.5 | ... | 96.7 | 24.7 |
| 2006 | -1,236,799 | 46.1 | 63.0 | 61.8 | ... | 96.0 | 26.9 |
| 03/2006 | -278,703 | XX | XX | 67.2 | ... | 93.0 | XX |
| 03/2007 | -627,081 | XX | XX | 52.2 | ... | 92.2 | XX |

## INVESTMENT YIELDS

| Year | Net Yield | Bonds | Stocks | Mort-gages | Cash & Short Term | Real Estate Gross | Net | Invest. Exp. Ratio |
|------|------|------|------|------|------|------|------|------|
| 2002 | 6.43 | 7.25 | 9.79 | 8.22 | 1.48 | 14.62 | 9.48 | 12.09 |
| 2003 | 6.14 | 6.70 | 9.33 | 8.06 | 0.35 | 17.41 | 11.11 | 11.69 |
| 2004 | 5.82 | 6.35 | 7.83 | 8.85 | 1.59 | 12.41 | 7.51 | 11.94 |
| 2005 | 5.69 | 6.29 | 5.33 | 7.66 | 2.82 | 10.15 | 4.65 | 12.23 |
| 2006 | 5.55 | 6.42 | 2.07 | 7.60 | 4.13 | 10.07 | 5.58 | 13.32 |

## INVESTMENT DATA

Copyright © 2007, A.M. Best Company. All Rights Reserved.
Reproduction and distribution of A.M. Best data to third parties is strictly
prohibited without express written consent. Visit the A.M. Best website at
http://www.ambest.com for the latest Best's Ratings and Best's Company Reports.

Best's Insurance Reports - Life Health, US, 2007 Edition (2006 Annual Data, Version 2007.1)
06684 - The Lincoln National Life Insurance Company

Current Year Distribution of Bonds By Maturity

| | 0-1 | 1-5 | 5-10 | 10-20 | 20- | Yrs-Avg Maturity |
|---|---|---|---|---|---|---|
| Government | 0.3 | 2.1 | 2.8 | 1.8 | 0.6 | 9 |
| Gov't Agencies & Muni | 0.5 | 2.6 | 2.9 | 1.5 | 0.1 | 7 |
| Public Utilities | 0.4 | 1.9 | 2.7 | 1.3 | 1.0 | 10 |
| Industrial & Misc | 7.9 | 23.8 | 24.6 | 8.3 | 12.7 | 9 |
| Capital Credit Loans | 0.0 | 0.0 | 0.1 | 0.2 | 0.0 | 13 |
| Total | 9.1 | 30.4 | 33.0 | 13.1 | 14.5 | 9 |

| | 2006 | 2005 | 2004 | 2003 | 2002 |
|---|---|---|---|---|---|
| Bonds (000) | 28,856,888 | 29,486,811 | 29,725,892 | 27,801,729 | 25,523,881 |
| US Government | 5.8 | 5.6 | 5.4 | 2.6 | 2.5 |
| Foreign Government | 2.0 | 2.5 | 2.5 | 2.5 | 2.3 |
| Foreign - All Other | 14.1 | 13.9 | 15.1 | 13.3 | 12.5 |
| State/Special Revenue - US | 7.6 | 7.9 | 7.9 | 9.5 | 7.9 |
| Public Utilities - US | 6.1 | 5.9 | 5.9 | 5.8 | 6.6 |
| Industrial & Misc - US | 64.1 | 63.9 | 62.8 | 66.0 | 68.2 |
| Credit Tenant Lns - US | 0.3 | 0.3 | 0.3 | 0.2 | ... |
| Private Issues | 28.7 | 28.5 | 30.5 | 30.7 | 29.6 |
| Public Issues | 71.3 | 71.5 | 69.5 | 69.3 | 70.4 |

| Bond Quality (%) | 2006 | 2005 | 2004 | 2003 | 2002 |
|---|---|---|---|---|---|
| Class 1 | 62.7 | 63.1 | 61.9 | 64.3 | 62.4 |
| Class 2 | 30.1 | 29.4 | 31.7 | 28.4 | 29.9 |
| Class 3 | 4.3 | 4.6 | 4.1 | 4.3 | 4.5 |
| Class 4 | 2.3 | 2.3 | 1.5 | 1.9 | 1.7 |
| Class 5 | 0.5 | 0.5 | 0.4 | 0.6 | 1.3 |
| Class 6 | 0.0 | 0.1 | 0.3 | 0.5 | 0.2 |

| Mortgages (000) | 2006 | 2005 | 2004 | 2003 | 2002 |
|---|---|---|---|---|---|
| | 3,101,363 | 3,181,543 | 3,372,803 | 3,685,007 | 3,731,886 |
| Commercial | 100.0 | 100.0 | 100.0 | 100.0 | 100.0 |
| Residential | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 |

| Real Estate (000) | 2006 | 2005 | 2004 | 2003 | 2002 |
|---|---|---|---|---|---|
| | 166,780 | 178,387 | 135,277 | 103,765 | 272,888 |
| Property Occupied by Co | 0.8 | 3.2 | 1.1 | 1.4 | 2.1 |
| Property Held for Sale | 99.2 | 96.8 | 98.9 | 98.6 | 97.9 |

| Stocks (000) | 2006 | 2005 | 2004 | 2003 | 2002 |
|---|---|---|---|---|---|
| | 1,231,786 | 1,062,241 | 1,019,912 | 967,396 | 992,885 |
| Unaffiliated Common | 2.6 | 1.2 | 2.3 | 4.8 | 9.1 |
| Affiliated Common | 76.1 | 82.3 | 83.5 | 80.0 | 72.8 |
| Unaffiliated Preferred | 21.2 | 16.5 | 14.3 | 15.2 | 18.1 |

| Other Inv Assets (000) | 2006 | 2005 | 2004 | 2003 | 2002 |
|---|---|---|---|---|---|
| | 3,300,109 | 3,884,365 | 3,088,193 | 3,362,888 | 3,218,230 |
| Cash | 16.8 | 36.8 | 26.2 | 26.1 | 24.4 |
| Short-Term | 12.4 | 8.3 | 7.5 | 12.4 | 10.1 |
| Schedule BA Assets | 18.7 | 10.1 | 11.6 | 10.2 | 11.3 |
| All Other | 52.1 | 44.9 | 54.7 | 51.4 | 54.2 |

## HISTORY

Date Incorporated: 06/12/1905            Date Commenced: 09/01/1905

Copyright © 2007, A.M. Best Company. All Rights Reserved.
Reproduction and distribution of A.M. Best data to third parties is strictly
prohibited without express written consent. Visit the A.M. Best website at
http://www.ambest.com for the latest Best's Ratings and Best's Company Reports.

Best's Insurance Reports - Life Health, US, 2007 Edition (2006 Annual Data, Version 2007.1)
06664 - The Lincoln National Life Insurance Company

Page 9

**Domicile:** IN

**Mergers:** Reliance Life Insurance Company, Pennsylvania, 1953; Lincoln National Pension Insurance Company, 1989; Jefferson-Pilot Life Insurance Company, North Carolina, 2007.

# OFFICERS

President, Dennis R. Glass; Chief Financial Officer, Frederick J. Crawford; Senior Vice Presidents, Charles C. Cornelio, Robert W. Dineen, Mark E. Konen, Douglas N. Miller, See Yeng Quek, Dennis L. Schoff, Michael S. Smith, Westley V. Thompson; Secretary, C. Suzanne Womack; Treasurer, Rise' C.M. Taylor; Chief Actuary, Todd H. Erkis.

# DIRECTORS

Frederick J. Crawford, Dennis R. Glass, Mark E. Konen, Barbara S. Kowalczyk, See Yeng Quek, Westley V. Thompson.

# REINSURANCE

The company utilizes reinsurance treaties with several insurers to protect against excess risks. Maximum net retention on any one life is $5,000,000.

# REGULATORY

An examination of the financial condition is being made as of December 31, 2002 by the Insurance Department of Indiana. The 2006 annual independent audit of the company was conducted by Ernst & Young, LLP. The annual statement of actuarial opinion is provided by Todd Erkis.

**Territory:** The company is licensed in the District of Columbia, Guam, Northern Mariana Islands, Puerto Rico, U.S. Virgin Islands, AL, AK, AZ, AR, CA, CO, CT, DE, FL, GA, HI, ID, IL, IN, IA, KS, KY, LA, ME, MD, MA, MI, MN, MS, MO, MT, NE, NV, NH, NJ, NM, NC, ND, OH, OK, OR, PA, RI, SC, SD, TN, TX, UT, VT, VA, WA, WV, WI and WY. It is also licensed in Canada in the provinces of Alberta, British Columbia, Manitoba, New Brunswick, Newfoundland and Labrador, Nova Scotia, Ontario, Prince Edward Island and Saskatchewan. The company is also an accredited reinsurer in New York and the Philippine Islands.

**Reserve basis:** (Current ordinary business): 1980 CSO 4.0%, 4.5% and 5.0%; CRVM and Net Level Premium (NLP). (Current annuity business): NLP Annuity 2000 1.50% to 6.50%, NLP 1994 GAR 6.25% to 6.50%, CARVM and applicable actuarial guidelines 5.50% to 6.75%.

# FINANCIAL INFORMATION

## BALANCE SHEET - December 31, 2006
### (in thousands of dollars)

| Assets | | Liabilities | |
|---|---|---|---|
| *Total bonds | 28,856,888 | +Net policy reserves | 32,283,337 |
| *Total preferred stocks | 261,570 | Policy claims | 187,796 |
| *Total common stocks | 970,215 | Accounts payable | 778,210 |
| Mortgage loans | 3,101,363 | Deposit type contracts | 607,776 |
| Real estate | 166,780 | Interest maint reserve | 150,286 |
| Contract loans | 1,712,806 | Comm taxes expenses | 447,317 |
| Cash & short-term inv | 962,827 | Asset val reserve | 457,997 |
| Prems and consids due | 52,654 | Funds held reinsurance | 1,803,992 |
| Accrued invest income | 426,971 | Other liabilities | -1,492,048 |
| Other assets | 1,746,519 | | |
| | | Tot liab w/o sep accts | 35,224,662 |
| Tot assets w/o sep accts | 38,258,594 | Separate account bus | 68,539,098 |
| Separate account bus | 68,540,507 | Total Liabilities | 103,763,760 |
| | | Common stock | 25,000 |
| | | Surplus notes | 1,250,000 |
| | | Paid in & contrib surpl | 1,456,227 |
| | | Unassigned surplus | 304,114 |
| Assets | 106,799,102 | Total | 106,799,102 |

*Securities are reported on the bases prescribed by the National Association of Insurance Commissioners. + Analysis of reserves; Life $11,959,500; annuities $19,549,107; supplementary contracts with life contingencies $9,453; accidental death benefits $784; disability active lives $20,872; disability disabled lives $37,310; miscellaneous reserves $606,850; accident & health $99,460.

Copyright © 2007, A.M. Best Company. All Rights Reserved.
Reproduction and distribution of A.M. Best data to third parties is strictly
prohibited without express written consent. Visit the A.M. Best website at
http://www.ambest.com for the latest Best's Ratings and Best's Company Reports.

Best's Insurance Reports - Life Health, US, 2007 Edition (2006 Annual Data, Version 2007.1)
06664 - The Lincoln National Life Insurance Company

## SUMMARY OF OPERATIONS
### (In thousands of dollars)

| Premiums: | | Death benefits | 418,503 |
|---|---|---|---|
| Ordinary life | 1,717,925 | Matured endowments | 2,852 |
| Individual annuities | 9,677,956 | Annuity benefits | 244,732 |
| Group life | 111 | Disability benefits | 3,073 |
| Group annuities | 2,471,865 | Surrender benefits | 10,005,080 |
| Acc & health group | -15 | Acc & health benefits | 497 |
| Acc & health other | 7 | Int on policy funds | 96,806 |
| Total premiums | 13,867,850 | Supplementary contracts | 2,036 |
| Net investment income | 2,033,177 | Incr life reserves | -516,497 |
| Amort interest maint res | -1,100 | Incr a & h reserves | -1,219 |
| Comm & exp reins ceded | 300,881 | Res adj reins assumed | -42,830 |
| Res adj on reins ceded | -528,841 | Commissions | 971,071 |
| Other income | 878,209 | Comm exp reins assumed | 208,521 |
| Mgt and/or service fee | 364,801 | Insur taxes lic & fees | 75,613 |
| | | General ins expenses | 572,183 |
| | | Net transf to sep acct | 4,437,848 |
| | | Misc operating expense | 6,703 |
| | | Other disbursements | -397 |
| Total | 16,914,976 | Total | 16,484,574 |

| | |
|---|---|
| Gain from operations before FIT & div to policyholders | 430,403 |
| Dividends to policyholders: life | 65,045 |
| Gains from operations after dividends to policyholders | 365,357 |
| Federal income taxes incurred | 129,077 |
| Net gain from operations after FIT and dividends | 236,280 |

## CASH FLOW ANALYSIS
### (In thousands of dollars)

| Funds Provided | | Funds Applied | |
|---|---|---|---|
| Gross cash from oper | 16,956,177 | Benefits paid | 10,733,864 |
| Long-term bond proceeds | 5,584,343 | Comm, taxes, expenses | 1,943,232 |
| Other invest proceeds | 903,879 | Transfer to sep account | 4,949,298 |
| Other cash provided | 99,966 | Long-term bonds acquired | 4,899,701 |
| Decr cash & short-term | 785,639 | Other cash applied | 1,803,909 |
| Total | 24,330,005 | Total | 24,330,005 |

## INTERIM BALANCE SHEET
### (In thousands of dollars)

Copyright © 2007, A.M. Best Company. All Rights Reserved.
Reproduction and distribution of A.M. Best data to third parties is strictly
prohibited without express written consent. Visit the A.M. Best website at
http://www.ambest.com for the latest Best's Ratings and Best's Company Reports.

Best's Insurance Reports - Life Health, US, 2007 Edition (2006 Annual Data, Version 2007.1)
04664 - The Lincoln National Life Insurance Company

Page 11

| Assets | 03/31/2007 | | |
|---|---|---|---|
| Total bonds | 26,014,940 | ... | ... |
| Total preferred stocks | 284,042 | ... | ... |
| Total common stocks | 1,525,792 | ... | ... |
| Mortgage loans | 3,123,661 | ... | ... |
| Real estate | 163,023 | ... | ... |
| Contract loans | 1,506,388 | ... | ... |
| Cash & short-term inv | 596,963 | ... | ... |
| Other invested assets | 735,478 | ... | ... |
| Accrued invest income | 408,573 | ... | ... |
| Other assets | 1,189,211 | ... | ... |
| Tot assets w/o sep accts | 35,548,071 | | |
| Separate account bus | 70,866,691 | ... | ... |
| Assets | 106,414,762 | | |

| Liabilities | 03/31/2007 | | |
|---|---|---|---|
| Net policy reserves | 30,035,870 | ... | ... |
| Policy claims | 157,035 | ... | ... |
| Interest maint reserve | 170,215 | ... | ... |
| Comm taxes expenses | 439,145 | ... | ... |
| Asset val reserve | 486,964 | ... | ... |
| Funds held rein treaty | 1,835,146 | ... | ... |
| Other liabilities | -652,007 | ... | ... |
| Tot liab w/o sep funds | 32,472,369 | | |
| Separate account bus | 70,865,278 | ... | ... |
| Total liabilities | 103,337,647 | | |
| Common stock | 25,000 | ... | ... |
| Surplus notes | 1,250,000 | ... | ... |
| Paid in & contrib surpl | 1,458,016 | ... | ... |
| Unassigned surplus | 344,099 | ... | ... |
| Total | 106,414,762 | | |

## INTERIM SUMMARY OF OPERATIONS

Copyright © 2007, A.M. Best Company.  All Rights Reserved.
Reproduction and distribution of A.M. Best data to third parties is strictly
prohibited without express written consent. Visit the A.M. Best website at
http://www.ambest.com for the latest Best's Ratings and Best's Company Reports.

Best's Insurance Reports - Life Health, US, 2007 Edition (2006 Annual Data, Version 2007.1)
08664 - The Lincoln National Life Insurance Company

|  | Period Ended 3/31/2007 | Period Ended 3/31/2006 | Increase/ (Decrease) |
|---|---|---|---|
| Prems & ann consid | 3,786,652 | 3,280,849 | 505,803 |
| Total premiums | 3,786,652 | 3,280,849 | 505,803 |
| Net investment income | 482,315 | 505,468 | -23,153 |
| Amort interest main res | -362 | -1,186 | 824 |
| Comm & exp reins ceded | 26,492 | 27,284 | -792 |
| Res adj on reins ceded | -111,608 | -24,402 | -87,206 |
| Other income | 350,140 | 291,486 | 58,655 |
| Total | 4,533,630 | 4,079,499 | 454,131 |
| Death benefits | 106,385 | 92,728 | 13,657 |
| Matured endowments | 891 | 570 | 321 |
| Annuity benefits | 62,997 | 61,349 | 1,648 |
| Surrender benefits | 2,859,888 | 2,387,229 | 472,659 |
| Disability and A&H ben | 683 | 619 | 64 |
| Int on policy funds | 14,505 | 13,104 | 1,401 |
| Supplementary contracts | 469 | 532 | -63 |
| Change in reserves | -233,554 | -84,546 | -149,008 |
| Commissions | 227,903 | 205,339 | 22,564 |
| Comm exp reins assumed | 2,859 | 2,550 | 309 |
| Insur taxes lic & fees | 24,441 | 22,170 | 2,270 |
| General ins expenses | 171,643 | 164,986 | 6,657 |
| Net transf to sep acct | 1,147,703 | 1,070,510 | 77,193 |
| Other disbursements | -11,235 | -13,847 | 2,613 |
| Total | 4,375,578 | 3,923,295 | 452,284 |
| Gain from operations before FIT & div to policyholders | 158,051 | 156,204 | 1,847 |
| Dividends to policyholders | 11,997 | 16,030 | -4,034 |
| Gain from operations after dividends to policyholders | 146,055 | 140,174 | 5,881 |
| Federal income taxes incurred | 16,658 | 75,703 | -59,045 |
| Net gain from operations after FIT and dividends | 129,397 | 64,471 | 64,926 |

## SEPARATE ACCOUNT DATA

|  | 2006 | 2005 | 2004 | 2003 | 2002 |
|---|---|---|---|---|---|
| Sep Acct Assets | 68,540,507 | 56,036,064 | 48,092,793 | 40,537,638 | 31,734,639 |
| % Growth | 22.3 | 16.5 | 18.6 | 27.7 | -17.9 |
| S/A Assets/Adm Assets | 64.2 | 58.8 | 55.2 | 51.9 | 47.3 |
| Sep Acct Reserves | 66,144,638 | 54,573,933 | 46,851,436 | 39,495,653 | 30,606,015 |
| % Ordinary Life | 3.7 | 3.9 | 3.8 | 3.7 | 3.4 |
| % Individual Annuities | 83.0 | 82.1 | 81.5 | 81.7 | 83.6 |
| % Group Annuities | 13.3 | 14.1 | 14.7 | 14.6 | 13.1 |
| Deposit Type Liabilities | 400,726 | ... | ... | ... | ... |
| Other Liabilities | 1,993,733 | 1,461,965 | 1,241,204 | 1,041,846 | 1,085,461 |
| Sep Acct Surplus | 1,410 | 166 | 153 | 139 | 43,164 |
| S/A Prems & Deposits | 10,300,238 | 8,170,603 | 7,425,386 | 4,488,112 | 4,500,089 |
| % Ordinary Life | 4.8 | 5.4 | 6.2 | 7.9 | 9.1 |
| % Individual Annuities | 77.2 | 72.7 | 65.6 | 54.0 | 62.0 |
| % Group Annuities | 18.0 | 21.9 | 28.2 | 38.2 | 28.9 |

Copyright © 2007, A.M. Best Company. All Rights Reserved.
Reproduction and distribution of A.M. Best data to third parties is strictly
prohibited without express written consent. Visit the A.M. Best website at
http://www.ambest.com for the latest Best's Ratings and Best's Company Reports.

Best's Insurance Reports - Life Health, US, 2007 Edition (2006 Annual Data, Version 2007.1)
66664 - The Lincoln National Life Insurance Company

| | | | | | |
|---|---|---|---|---|---|
| Sep Acct Fees & Charges | 878,209 | 723,872 | 616,382 | 515,909 | 524,452 |
| % Ordinary Life | 18.4 | 20.6 | 22.7 | 25.8 | 25.8 |
| % Individual Annuities | 75.7 | 72.7 | 70.2 | 66.9 | 68.5 |
| % Group Annuities | 5.9 | 6.7 | 7.1 | 7.2 | 5.7 |
| Fees & Chgs to Assets | 1.4 | 1.4 | 1.4 | 1.4 | 1.5 |
| | | | | | |
| Sep Acct Ben & Wdrwls | 6,604,139 | 5,540,866 | 5,212,264 | 4,257,012 | 4,525,009 |
| % Ordinary Life | 2.1 | 2.4 | 3.8 | 2.1 | 1.9 |
| % Individual Annuities | 74.4 | 74.1 | 69.2 | 69.8 | 69.8 |
| % Group Annuities | 23.5 | 23.5 | 27.0 | 28.1 | 28.4 |
| Ben & Wdrwl to Assets | 10.6 | 10.6 | 11.8 | 11.8 | 12.9 |

## ORDINARY LIFE STATISTICS

| Year | Ord. Lapse Ratio % | Average Ord. Policy (in dollars) Issued | In Force | Avg. Prem ($/M) | 1st Yr Prem / Total Prem | 1st Yr Comm / 1st Yr Prem | Gen. Exp. / Policies In Force |
|---|---|---|---|---|---|---|---|
| 2002 | 8.1 | 843,222 | 83,263 | 4.75 | 48.6 | 15.4 | 42.00 |
| 2003 | 2.6 | 730,669 | 91,164 | 4.94 | 43.9 | 17.1 | 47.94 |
| 2004 | 8.2 | 526,949 | 94,657 | 4.86 | 43.9 | 18.9 | 46.75 |
| 2005 | 6.7 | 557,426 | 99,732 | 4.87 | 41.3 | 28.4 | 46.00 |
| 2006 | 6.5 | 665,493 | 103,997 | 5.10 | 40.0 | 28.7 | 23.78 |

| Year | # Policies Issued (000) | # Policies in Force (000) | First Year Premium (000) | Gen'l Exp/ Reserves (%) | Return on Reserves (%) |
|---|---|---|---|---|---|
| 2002 | 18 | 7,852 | 641,178 | 3.30 | 2.10 |
| 2003 | 23 | 7,829 | 720,264 | 3.50 | 0.77 |
| 2004 | 65 | 7,386 | 737,077 | 3.00 | -0.73 |
| 2005 | 59 | 6,881 | 703,198 | 2.65 | 1.23 |
| 2006 | 42 | 6,436 | 721,673 | 1.19 | -0.61 |

## INDIVIDUAL ANNUITY STATISTICS

| Year | NPW & Dep (000) | Res & Dep Liab (000) | Exp to Res & Dep Liab (%)* | Comm & Exp to NPW & Dep (%) | Benefits & Wdrwls to NPW & Dep (%) | Benefits & Wdrwls to Res & Dep Liab (%)* |
|---|---|---|---|---|---|---|
| 2002 | 4,702,091 | 41,130,236 | 0.6 | 11.6 | 110.1 | 12.6 |
| 2003 | 4,827,728 | 47,560,926 | 0.5 | 11.2 | 93.6 | 9.5 |
| 2004 | 6,922,678 | 53,480,497 | 0.6 | 10.5 | 72.7 | 9.4 |
| 2005 | 7,845,718 | 59,624,063 | 0.5 | 9.7 | 73.0 | 9.6 |
| 2006 | 9,679,117 | 68,190,754 | 0.5 | 9.0 | 75.3 | 10.7 |

* Includes Separate Account reserves.

## GROUP ANNUITY STATISTICS

Copyright © 2007, A.M. Best Company. All Rights Reserved.
Reproduction and distribution of A.M. Best data to third parties is strictly
prohibited without express written consent. Visit the A.M. Best website at
http://www.ambest.com for the latest Best's Ratings and Best's Company Reports.

Best's Insurance Reports - Life Health, US, 2007 Edition (2006 Annual Data, Version 2007.1)
06664 - The Lincoln National Life Insurance Company

Page 14

| Year | NPW & Dep (000) | Res & Dep Liab (000) | Exp to Res & Dep Liab (%)* | Comm & Exp to NPW & Dep (%) | Benefits & Wdrwls to NPW & Dep (%) | Benefits & Wdrwls to Res & Dep Liab (%)* |
|------|------|------|------|------|------|------|
| 2002 | 2,119,968 | 8,607,847 | 1.2 | 6.5 | 84.6 | 20.8 |
| 2003 | 2,399,143 | 11,409,147 | 1.1 | 7.1 | 69.3 | 14.6 |
| 2004 | 3,522,005 | 13,078,023 | 1.0 | 5.0 | 53.8 | 14.5 |
| 2005 | 3,195,862 | 13,974,294 | 1.0 | 6.5 | 65.5 | 15.0 |
| 2006 | 3,508,004 | 15,804,786 | 0.8 | 5.3 | 66.6 | 14.8 |

* Includes Separate Account reserves.

## TOTAL ANNUITY ACTUARIAL RESERVES AND DEPOSIT TYPE LIABILITIES BY WITHDRAWAL CHARACTERISTICS

| Year | Total Annuity Res & Dep Liab (000)* | Min or No Surrender Charge (%)* | With Surrender Charge 5% or more (%)* | With MVA (%)* | No Surrender Allowed (%)* |
|------|------|------|------|------|------|
| 2002 | 51,158,739 | 82.6 | 6.9 | 4.6 | 5.9 |
| 2003 | 60,702,613 | 84.2 | 6.8 | 4.0 | 5.1 |
| 2004 | 68,053,857 | 87.4 | 5.1 | 3.9 | 3.6 |
| 2005 | 74,905,489 | 88.6 | 5.0 | 3.3 | 3.2 |
| 2006 | 84,790,269 | 90.7 | 2.5 | 3.9 | 2.8 |

* Includes Separate Account reserves.

## NEW LIFE BUSINESS ISSUED
### (in thousands of dollars)

| Year | Whole Life & Endow | Term | Credit | Group | Indus-trial | Total Insurance Issued | Non-Par (%) | Par (%) |
|------|------|------|------|------|------|------|------|------|
| 2001 | 11,751,639 | 1,548,907 | ... | 160 | ... | 13,300,706 | 100 | ... |
| 2002 | 10,918,079 | 4,147,760 | ... | 150 | ... | 15,065,989 | 100 | ... |
| 2003 | 16,692,742 | 187,914 | ... | 110 | ... | 16,880,766 | 100 | ... |
| 2004 | 10,326,518 | 24,014,215 | ... | 475 | ... | 34,341,208 | 100 | ... |
| 2005 | 11,440,827 | 21,464,005 | ... | 255 | ... | 32,905,087 | 100 | ... |
| 2006 | 11,042,934 | 17,142,042 | ... | 10 | ... | 28,184,986 | 100 | ... |

## LIFE INSURANCE IN FORCE
### (in thousands of dollars)

| Year | Whole Life Endow & Adds | Term | Credit | Group | Industrial | Total Insurance In Force |
|------|------|------|------|------|------|------|
| 2001 | 131,348,360 | 443,021,360 | 666,401 | 23,086,911 | ... | 598,123,032 |
| 2002 | 142,387,966 | 511,411,911 | 603,341 | 19,524,702 | ... | 673,927,920 |
| 2003 | 149,500,236 | 564,244,063 | 6,295,766 | 9,807,398 | ... | 729,847,463 |
| 2004 | 113,507,461 | 585,606,813 | 6,295,758 | 3,489,891 | ... | 708,899,923 |
| 2005 | 120,607,860 | 565,628,815 | 3,669,894 | 1,828,692 | ... | 691,735,261 |
| 2006 | 126,282,597 | 543,079,901 | 3,128,806 | 1,669,499 | ... | 674,160,803 |

Copyright © 2007, A.M. Best Company. All Rights Reserved.
Reproduction and distribution of A.M. Best data to third parties is strictly
prohibited without express written consent. Visit the A.M. Best website at
http://www.ambest.com for the latest Best's Ratings and Best's Company Reports.

1

**PROOF OF SERVICE**

2

STATE OF CALIFORNIA, COUNTY OF LOS ANGELES

3

       I am employed in the County of Los Angeles, State of California.  I am over the age of
4    18 and not a party to the within action; my business address is:  Barger & Wolen LLP, 633 West
     Fifth Street, 47th Floor, Los Angeles, California 90071-2043.

5

       On **September 21, 2007** , I served the foregoing document(s) described as **NOTICE**
6    **OF REMOVAL; DECLARATION OF MICHAEL A.S. NEWMAN** on the interested parties
     in this action by placing [ ] the original [X] a true copy thereof enclosed in sealed envelope
7    addressed as stated in the attached mailing list.

8          **Frank N. Darras**                          **Counsel for Plaintiff**
           **Shernoff Bidart & Darras LLP**             **TIMOTHY E. MCNARY**
9          **3257 East Guasti Road, Suite 300**
           **Ontario, California  91761**
10         **Telephone No.: (909) 390-3770**
           **Facsimile No.: (909) 974-2121**

11

12   [X] **BY MAIL**

13         [X] I am "readily familiar" with the firm's practice of collection and processing
               correspondence for mailing.  Under that practice it would be deposited with U.S. Postal
14             Service on that same day with postage thereon fully prepaid at Los Angeles, California
               in the ordinary course of business.  I am aware that on motion of the party served,
15             service is presumed invalid if postage cancellation date or postage meter date is more
               than one day after date of deposit for mailing in affidavit.

16   [ ] **OVERNIGHT DELIVERY**
           [ ] I am "readily familiar" with the firm's practice of collection and processing
17             correspondence for overnight delivery.  Under that practice it would be deposited in a box
               or other facility regularly maintained by the express service carrier, or delivered to an
18             authorized courier or driver authorized by the express service carrier to receive
               documents, in an envelope or package designated by the express service carrier with
19             delivery fees paid or provided for, addressed to the person on whom it is to be served, at
               the office address as last given by that person on any document filed in the cause and
20             served on the party making service; otherwise at that party's place of residence.

21   [ ] **BY PERSONAL SERVICE**

22         [ ] I caused such envelope to be delivered to a commercial messenger service with
               instructions to personally deliver same to the offices of the addressee on this date.

23   [ ] **BY FACSIMILE**

24         [ ] By transmitting an accurate copy via facsimile to the person and telephone number as
               follows: **Frank Darras (Fax No. 909-974-2121)**

25   [X]      **(FEDERAL)** I declare that I am employed in the office of a member of the bar of this
                        Court at whose direction the service was made. Executed at Los Angeles,
26                      California on **September 21, 2007.**

27
     MELANIE A. TAVERA
28   (Name)                              (Signature)

BARGER & WOLEN LLP
633 WEST FIFTH STREET
FORTY-SEVENTH FLOOR
LOS ANGELES, CA 90071
(213) 680-2800

i:\office7\7197\208\07pleadings\proof - usdc.doc

PROOF OF SERVICE                                  **55**